UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:15 CR 404-HEA (NAB) |
| | ) | |
| ANTHONY JORDAN, | ) | THIS IS A CAPITAL CASE |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS THE INDICTMENT BASED ON SELECTIVE AND VINDICTIVE
PROSECUTION OR OTHER ALTERNATIVE GROUNDS**

COMES NOW the United States of America, and hereby opposes defendant Jordan's "Motion to Dismiss the Indictment Based on Selective and Vindictive Prosecution or in the Alternative Strike the Notice of Intent to Seek the Death Penalty or Provide the Defendant with Additional Discovery Regarding the Decision to Seek the Death Penalty" (Doc #s 2423 & 2424) as follows:

**INTRODUCTION**

Jordan seeks to have his indictment dismissed, the notice of intent to seek the death penalty dismissed, or alternatively for discovery, on the grounds that the United States is selectively and vindictively prosecuting Jordan because he exercised his constitutional right to a jury trial. Jordan bears the burden of establishing that others similarly situated were not prosecuted for similar conduct, and that he was singled out because of the exercise of his right to have a jury trial. Jordan argues that Adrian Lemons, Derrick Terry, Gloria Ward, Maurice Woodson, and Charles Thompson are the similarly situated defendants who establish that Jordan was vindictively singled out because the death penalty was not sought against them, although they faced death-eligible

1

charges.  However, at the most basic level, none of the above-mentioned defendants were involved
in as many murders as Jordan.  Thus, they are not "similarly situated" for purposes of a selective
or vindictive prosecution claim.

Jordan also fails to establish that he was punished for exercising his right to proceed to
trial.  He has produced no objective evidence of vindictive motive, nor has he established that the
circumstances of the case warrant a presumption of vindictiveness.  While most pre-trial vindictive
prosecution claims based on the exercise of the right to proceed to trial argue that a defendant was
punished after rejecting a plea offer made by the prosecution, Jordan raises no such allegation here.
Therefore, Jordan was in no different position than any of the other capital-eligible defendants at
the time that the various superseding indictments were returned and at the time that the decision
whether or not to seek the death penalty was made because they, as well as Jordan, had not entered
pleas and were on a path to proceed to trial.[1]  Nonetheless, although those defendants were in the
same position as Jordan in exercising their right to proceed to trial, those defendants did not have
the death penalty sought against them, thus negating Jordan's argument that the United States was
vindictive and sought to punish Jordan for proceeding to trial.

Jordan's references to an Attorney General speech and a New York Times article do not
help him meet his burden, and operate merely as distractions from the legal decision the Court
must make.  Former Attorney General Jefferson B. Sessions' speech in Saint Louis, Missouri,
which briefly mentioned the murder of Clara Walker, and the New York Times article discussing
the Department of Justice's Capital Case Section, do not support Jordan's argument that the United
States acted vindictively in returning superseding indictments, or in seeking the death penalty

---

[1] Those death-eligible defendants who eventually entered pleas did not do so until *after* the
decision not to seek the death penalty against them.

2

against him.  Neither event demonstrates bias or prejudice against Jordan or suggest that he has been vindictively prosecuted.

Finally, Jordan is not entitled to discovery or an evidentiary hearing because he has not met his burden.  Having failed to establish either prong of his selective and vindictive prosecution claim, Jordan's motion must be denied in its entirety.

## ARGUMENT

## I.   JORDAN HAS FAILED TO MEET HIS BURDEN IN ESTABLISHING A VINDICTIVE PROSECUTION CLAIM

A person making a selective prosecution claims must establish that a federal prosecutorial policy had a discriminative effect and that it was motivated by a discriminatory purpose.  *See United States v. Armstrong*, 517 U.S. 456, 465 (1996).  In other words, a selective prosecution claimant must show "1) that he has been singled out for prosecution while others similarly situated have not been prosecuted for similar conduct and 2) that the government's action in thus singling him out was based on an impermissible motive such as race, religion, or the exercise of constitutional rights."  *United States v. Parham*, 16 F.3d 844, 846 (8th Cir. 1994).  Jordan bears the burden of proof in establishing the United States engaged in selective prosecution.  *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004).  A defendant must prove both prongs by "clear evidence."  *Armstrong*, 517 U.S. at 465.  The standard for establishing a selective prosecution claim "is a demanding one."  *Id.* at 463; *see also United States v. Matter*, 818 F.2d 653, 654-55 (8th Cir. 1987) ("The defendant's burden is a heavy one, and because we afford broad discretion to prosecuting authorities, we require 'a showing of "intentional and purposeful discrimination."'") (citations omitted).

"Vindictive prosecution occurs when a prosecutor seeks to punish a defendant solely for exercising a valid legal right."  *United States v. Williams*, 793 F.3d 957, 963 (8th Cir. 2015).  "A

prosecution designed solely to punish a defendant for exercising a valid legal right violates due process." *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004). Jordan also "has the burden of establishing vindictiveness, in the sense of bad faith or maliciousness." *Hirsch*, 360 F.3d at 864.

Jordan has offered no evidence, and makes no allegation, that race or gender played a role in the United States' charging decisions. His claim relies on the argument that the death penalty was sought against him because he chose to proceed to trial. Jordan bears the burden of showing the prosecution was brought to punish him for exercising a legal right. *See United States v. Kriens*, 270 F.3d 597, 602 (8th Cir. 2001). "To establish an actual vindictive motive, a defendant must prove objectively that the prosecutor's charging decision was a 'direct and unjustifiable penalty,' that resulted 'solely from the defendant's exercise of a protected legal right.'" *United States v. Sanders*, 211 F.3d 711, 716-17 (2d Cir. 2000) (internal citations omitted).

## A. Jordan Has Not Established that Similarly Situated Defendants Have Been Treated Differently

Jordan argues that similarly situated defendants have been treated differently because "despite the fact that several co-defendants were charged alongside Mr. Jordan with the identical alleged death eligible acts, the Government declined to seek the death penalty against them." *See* Doc. # 2424 at 2. Jordan argues that the failure to seek the death penalty against Adrian Lemons, Derrick Terry, Maurice Woodson, Gloria Ward, Virgil Sims, and Charles Thompson[2] establishes that similarly situated defendants have been treated differently. Although he requests dismissal of the indictment in its entirety, his argument primarily focuses on the disparate treatment relevant to the decision to seek the death penalty against him.

---

[2] Contrary to Jordan's assertion, Jose Alfredo Velasquez was never charged with a death-eligible offense.

To be similarly situated, "[the defendants'] circumstances [must] present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997) (internal quotation marks and citations omitted).

> A 'similarly situated' person for selective prosecution purposes [is] one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant – so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan.

*United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000); *see also United States v. White*, 928 F.3d 734, 743 (8th Cir. 2019) (citing the *Smith* definition of "similarly situated" in drawing conclusion that defendant who faced marijuana-related prosecution had not established that those engaged in similar conduct in states where marijuana is legalized were similarly situated to him because those individuals were subject to regulations which defendant was not).

There are a number of considerations that may factor into a prosecutor's charging decision, including "the strength of the case, the prosecution's general deterrence value, the government's enforcement priorities, and the cases's relationship to the Government's overall enforcement plan." *Armstrong*, 517 U.S. at 465.

Jordan argues that the failure to capitally authorize Adrian Lemons, Derrick Terry, Gloria Ward, Maurice Woodson and Charles Thompson demonstrates Jordan was singled out for prosecution. *See* Doc. # 2424 at 2. Yet, none of these co-defendants are similarly situated because none of the defendants mentioned by Jordan was charged with, or implicated in, *all* of the same murders with which Jordan is charged. Jordan faces 11 capital counts of using a firearm in furtherance of a drug-trafficking crime resulting in death, accounting for his involvement in the murders of 11 individuals during the course of seven different criminal episodes. In contrast:

Adrian Lemons.  Lemons is implicated in two murders, that of Byron "BK" Earts, as charged in Count 20 of the Fifth Superseding Indictment (Doc. # 1989), and that of William "Lil Will" Thomas as was charged in Count 20 of the Fourth Superseding Indictment (Doc. # 679), a charge which was not included in the Fifth Superseding Indictment.  Among other things, Lemons was responsible for the recruitment of and payment to the two individuals present at the time Earts was killed.  Recruitment and payment were done by Lemons on Jordan's behalf.  Distinct from Earts' murder, the Thomas murder occurred as the result of an on-going drug feud in Kennett, Missouri, some 200 miles away from the City of Saint Louis, between Lemons' drug trafficking organization and Thomas.  While Jordan was an associate of Lemons' drug trafficking organization, Jordan was not directly involved in any way with the Thomas murder and was never named as a defendant in that regard.

Unlike Jordan, who has been charged with 11 instances of murder, Lemons is implicated in two murders.

Derrick Terry.  Terry is implicated in three murders committed in the course of two criminal episodes for which Jordan faces charges in the Fifth Superseding Indictment: that of Marquis Jones, as charged in Count 4; Keairrah Johnson, as charged in Count 5; and Anthony "Blinky" Clark, as charged in Count 7.  Terry served as the driver in both instances.  Prior to Jordan killing Jones and Johnson, Terry was meeting with Jordan about the purchase of a vehicle.  While on what Terry believed to be a test drive of the vehicle, Jordan directed Terry to follow the vehicle being occupied by Jones, Johnson and others.  As Terry pulled alongside the vehicle, Jordan opened fire killing both Jones and Johnson.  Similarly, Terry was with Jordan as Jordan conducted surveillance of the location where Clark was staying.  When Clark exited the location, Jordan instructed Terry to pull their vehicle forward as Clark began to enter a parked vehicle.  Jordan

exited the vehicle being driven by Terry and opened fire on Clark.

Unlike Jordan, who has been charged in 11 instances of murder, Terry was implicated in three.

Gloria Ward.  Ward is implicated in four murders charged in the Fifth Superseding Indictment: that of Anthony "Blinky" Clark in Count 7; Robert Parker and Clara Walker as charged in Counts 9 and 10; and Michail Gridiron as charged in Count 11.  Ward is also implicated in the uncharged murder of Dion Stovall and the uncharged murders of Michael Hennings and Ashley Townsend.  Jordan is also implicated in the murders of Stovall, Hennings and Townsend, but is not charged with those murders.  Although she is implicated in seven deaths, Ward was never present and did not participate as a shooter in any of the homicides.  Thus, she is not similarly situated to Jordan who is not only responsible for more deaths, but who in most instances was present and personally committed the murders.

Maurice Woodson.  Woodson is implicated in two murders charged in the Fifth Superseding Indictment: that of Byron "BK" Earts, as charged in Count 20, and Dante Jones, as charged in Count 27.  Jordan is separately charged with these murders in Counts 8 and 12, respectively.  In both instances, Woodson was recruited at Jordan's direction and carried out the homicides at Jordan's behest.  Likewise, Woodson was compensated by Jordan, or on Jordan's behalf, for his role in the two murders.  Separate and apart from the Earts and Jones murders, Woodson was responsible for the shooting and murder of William "Lil Will" Thomas as was charged in Count 20 of the Fourth Superseding Indictment (Doc. # 679), a charge which was not included in the Fifth Superseding Indictment.  Thomas' murder occurred as the result of an on-going drug feud between the Lemons drug trafficking organization and Thomas that existed in Kennett, Missouri.  While Jordan was an associate of Lemons' drug trafficking organization,

Jordan was not directly involved in any way with the Thomas murder and was never named as a defendant in that regard.  As of the time of this filing, Woodson has pleaded not guilty and retained his right to proceed to trial.

Unlike Jordan who has been charged in 11 instances of murder, Woodson was implicated in three.

Charles Thompson.  Charles Thompson is charged in three murders set forth in the Fifth Superseding Indictment: that of Robert Parker and Clara Walker as charged in Counts 15 and 16, and Michail Gridiron, as charged in Count 17.  (Jordan is separately charged with these murders in Counts 9, 10 and 11, respectively.)  Thompson is also implicated in the uncharged murders of Stovall, Hennings and Townsend in which Jordan is also implicated, but not charged.  Thompson was incarcerated at the time of each murder.  Similar to Gloria Ward, although he is implicated in six deaths compared to the 11 murders Jordan is charged with, Thompson was never present and did not participate as a shooter in any of the homicides.  As of the time of this filing, Thompson has pleaded not guilty and retained his right to proceed to trial.

Virgil Sims.  Sims, another capital-eligible defendant, was implicated in one murder, that of William "Lil Will" Thomas, which was charged in Count 20 of the Fourth Superseding Indictment, but was not included in the Fifth Superseding Indictment.  Sims was the driver of the vehicle that transported Woodson to and from the murder scene.  As discussed, the Thomas murder occurred as the result of an on-going drug feud in Kennett, Missouri, between the Lemons drug trafficking organization and Thomas.  While Jordan was an associate of Lemons' drug trafficking organization, Jordan was not directly involved in any way with the Thomas murder and was never named as a defendant in that regard.

Unlike Jordan, who has been charged with 11 instances of murder, Sims was implicated in

one.

Uncharged Co-conspirator. Jordan references another co-conspirator who was not charged with a death-eligible offense but was charged in a separate federal indictment with a violation of 18 U.S.C. § 924(c).  *See* Doc. # 2424 at 2-3.  As counsel is aware through discovery, that person is implicated in the murders of Robert Parker, Clara Walker and Michail Gridiron, as well as the uncharged murder of Montez Woods, in which Jordan is also implicated but not charged.  Jordan is also responsible for the uncharged murders of Michael Hennings and Ashley Townsend.  Jordan utilized ammunition provided by the uncharged co-conspirator in carrying out those murders.  The referenced co-conspirator is not similarly situated to Jordan because he is implicated in far fewer murders than the 11 murders with which Jordan is charged.  Likewise, the separate federal indictment against the uncharged co-conspirator was initiated on January 29, 2015 -- some seven months before Jordan was charged in his original indictment.  Among other things, the progression of that uncharged co-conspirator's federal case placed him in a drastically different position than Jordan presently finds himself.  Any suggestion of similarity between this uncharged co-conspirator and Jordan would be striking in its baselessness.

These co-defendants are not similarly situated to Jordan because none is responsible for the same number of murders as Jordan.

Jordan also argues that the decision "not to charge others with the same death eligible offenses as Mr. Jordan based on their alleged involvement in those offenses" (Doc. # 2424 at 7) establishes that Jordan was singled out for prosecution.  Yet he provides no support for this allegation or discussion and analysis of specific persons.  Nor will he be able to do so as the United States is not aware of any co-defendant or co-conspirator who was involved with Jordan in *all* 11 murders with which he is charged.

9

The above analysis alone discussing the numbers of murders each person is implicated in demonstrates that the individuals Jordan is relying upon are not, in fact, similarly situated to Jordan.  But Jordan's comparison contains further flaws.  When attempting to identify similarly situated defendants in the context of a capital case and the decision to seek the death penalty, the determination as to who may be similarly situated cannot end only with a discussion of the crimes with which the persons are charged.  In order to identify persons as similarly situated in the capital context, a comparison between those persons and Jordan would need to include a comparison of applicable threshold intent factors (*see* 18 U.S.C. § 3591(a)(2)) and statutory aggravating factors (*see* 18 U.S.C. § 3592(c)), as each is the functional equivalent of an element of the offense in the context of a capital case.  *See generally, Ring v. Arizona*, 536 U.S. 584 (2002) (holding that factors necessary to make a defendant eligible for the death penalty are "the functional equivalent of an element of a greater offense' and must be decided by a jury); *citing Apprendi v New Jersey*, 530 U.S. 466 (2000).  Indeed, a truly accurate comparison would require consideration of all relevant aggravating and mitigating circumstances applicable to each person alleged to be similarly situated in comparison to those applicable to Jordan.  Differences between the aggravating and mitigating circumstances of each defendant would signify that the defendants are *not* similarly situated.

The significance of the presence of absence of aggravating and mitigating circumstances to the capital decision is well-established.  The FDPA requires that the Attorney General give notice of its intent to seek the death penalty where he or she "believes that the circumstances of the offense are such that a sentence of death is justified under this chapter."  *See* 18 U.S.C. § 3593(a).  Those circumstances are the aggravating and mitigating factors as discussed in § 3592, and include victim impact evidence and other non-statutory aggravating factors (§ 3593(a)).  The Department's death penalty protocol as outlined in the Justice Manual (J.M.) also requires the

consideration of aggravating and mitigating factors (*see* J.M. § 9-10.140(C)) as well as other "legitimate law enforcement or prosecutorial reason[s]" (*see* J.M. § 9-10.140(D) (listing possible considerations)) when making a recommendation or decision about seeking the death penalty.  It would be difficult to argue that a determination can be made whether persons are similarly situated in the capital context without considering the applicable aggravating and mitigating circumstances. Yet Jordan undertakes no discussion of the relative role of each defendant in the alleged murders, let alone what aggravating and mitigating circumstances may apply.

Jordan has not met his burden in establishing that there are other persons who are similarly situated to him.  He has therefore failed to establish the first requirement necessary to succeed on a selective prosecution claim and as such his entire claim fails.  The Court need not consider the second part of the test as Jordan must satisfy both in order to succeed on his claim.  However, Jordan has also failed to establish the second part of his burden, as demonstrated below.

### B. Jordan Has Failed To Establish He Was Vindictively Punished for Exercising His Legal Right to A Trial

Jordan bears the burden of proving an impermissible motive on the part of the prosecutor. Because prosecutors have broad discretion in charging cases, the defendant's burden of proof is high.  *See Leathers*, 354 F.3d at 961 (8th Cir. 2004) ("The defendant's evidentiary burden is a heavy one, and we are mindful of the broad discretion given to prosecutors in carrying out their duty to enforce criminal statutes.")    As the Supreme Court has acknowledged, "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution.  An initial decision should not freeze future conduct." *United States v. Goodwin*, 457 U.S. 368, 382 (1982).  Further, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file . . . generally rests entirely in [the prosecutor's]

discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

Courts have routinely rejected pre-trial complaints of vindictive prosecution.  In *Goodwin*, the United States Supreme Court rejected a defendant's assertion of vindictive prosecution where he faced additional charges after rejecting a plea negotiation.  457 U.S. at 384-85.  Similarly, in *Williams*, the Eighth Circuit also rejected a claim that he was vindictively prosecuted because he was indicted on additional charges after he rejected a plea offer.  793 F.3d at 963.  The Court noted that "timing alone is insufficient to trigger the presumption of vindictiveness."  *Id.*  In *United States v. Stenger*, 605 F.3d 492 (8th Cir. 2010), the Court upheld a district court's rejection of a defendant's claim of vindictive prosecution where the prosecutor asserted it would file a "three strikes" notice if an agreement was not reached and then doing so in a superseding indictment when the defendant rejected the plea negotiation.  *Id.* at 498-99; *see also Bordenkircher*, 434 U.S. at 364-65 (finding no due process violation when prosecuted in the course of plea bargaining, threatened to seek an indictment under the Habitual Criminal Act if the defendant did not plead guilty to the original charge).

Prosecutorial vindictiveness can be proven with objective evidence.  *Williams*, 793 F.3d at 963.  In rare instances, a presumption of vindictiveness can be found "if [a defendant] provides sufficient evidence to show a reasonable likelihood of vindictiveness exists."  *Id.*  A court determining the existence of a presumption of vindictiveness must "examine 'the prosecutor's actions in the context of the entire proceedings."  *Id. quoting United States v. Chappell*, 779 F.3d 872, 880 (8th Cir. 2015).  Jordan has failed to establish objective evidence of vindictiveness, nor has he shown that a presumption of vindictiveness should be applied.

*(1) Jordan has failed to produce objective evidence of a vindictive motive*

Jordan has failed to offer any objective evidence of vindictive prosecution in this case.

Indeed, Jordan has failed to even articulate how he "exercised" his right to proceed to trial, for which action he is being vindictively punished.  *C.f. Bordenkircher*, 434 U.S. at 358-58 (defendant argued that prosecutor acted vindictively when he "carrie[d] out a threat made during plea negotiations to reindict the accused on more serious charges if he does not plead guilty to the offense with which he was originally charged."); *Williams*, 793 F.3d at 963 (the defendant argued "that the prosecution sought to punish him for exercising his legal right to a trial when the government filed the five-count superseding indictment following Williams' refusal of the government's plea deal");  *Leathers*, 354 F.3d at 958-59, 962 (defendant argued the federal prosecution was motivated by the state prosecutor's unhappiness with the bail amount set for the defendant in state court).  Jordan has not argued that he is being punished for rejecting a plea negotiation, nor has he cited to any other precipitating act which drew the prosecutor's malice.

In theory, perhaps one could argue (though Jordan has not) that by not pleading guilty to all charges without a plea negotiation, a defendant "exercises" his constitutional right to a trial. But such an argument would certainly be insufficient to overcome the presumption of regularity in a prosecutor's charging decisions since, as the Supreme Court has explained:

> [A] defendant before trial is *expected* to invoke procedural rights that inevitably impose some " burden" on the prosecutor.  Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; to plead an affirmative defense; to request psychiatric services; to obtain access to government files; *to be tried by jury*.  It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter.  The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.

*Goodwin*, 457 U.S. at 381 (emphasis added).  To the extent the failure to plead guilty to all charges without negotiation could be considered an exercise of that right, any inference that Jordan was vindictively prosecuted for failing to do so is rebutted by the fact that other defendants have also failed to plead guilty to all charges without negotiation, yet the death penalty was not sought

against them.

Presumably as objective evidence of the prosecution's bias, Jordan cites to a March 31, 2017 speech by then-Attorney General Jefferson B. Sessions in Saint Louis, Missouri, and the publication of a New York Times article about the Department's Capital Case Section.  Yet neither establishes evidence of bias.  With respect to the Saint Louis speech, Jordan argues that, "[i]n the wake of this visit, the Government embarked on a heretofore-unprecedented endeavor to revisit the decision not to seek the death penalty against Mr. Jordan."  *See* Doc. # 2424 at 5.  Yet Jordan's assertion here that the continued consideration of the decision to seek the death penalty against Jordan occurred after the Saint Louis speech is inaccurate.  After the initial indictment (Doc. # 1) against Jordan in August 2015, where he was charged only with the murders of Parker and Walker and Gridiron, the prosecution advised the Court and counsel in February 2016 that the death penalty would not be sought against Jordan.  By the time of the Third Superseding Indictment (Doc. # 391) in April of 2016, Jordan faced charges for two additional murders.  In December 2016, charges were added against Jordan for the murders of Keairrah Johnson and Marquis Jones in the Fourth Superseding Indictment (Doc. # 679).  At least as of June 10, 2016, some 11 months before the Saint Louis Attorney General visit, the Court and defense counsel were well aware that the death penalty decision as to Jordan, who at that time already faced additional capital-eligible counts, remained under consideration.  *See* Doc. # 540 ("[T]he United States of America . . . respectfully notifies the Court and the parties that the decision as to authorization to seek or not seek the death penalty as to defendants Adrian Lemons, Anthony Jordan, Derrick Terry, Maurice Woodson and Gloria Ward remains under consideration.").  Thus, the Saint Louis speech had no bearing on the continued consideration of the decision whether or not to seek the death penalty against Jordan.

14

Even if the timing were as Jordan alleges, the speech itself does not demonstrate any prosecutorial bias or vindictiveness.  The entirety of the speech is attached here as Exhibit A.  The murder of Mrs. Walker is referenced in one paragraph of the four page speech.  *See* Exhibit A at 3.  Reference to her murder was given as an example of innocent people caught in the crossfire of gang and narcotic-related violence.  *Id.*  Jordan was not mentioned by name and there was no discussion of what punishment Mrs. Walker's murderer should face and no reference to the case against Jordan.  Indeed, the overarching theme of that section of the speech was the epidemic of heroin and opioid abuse affecting the United States and the result of that abuse.  The speech discussed how to address that epidemic, including not just criminal enforcement, but also treatment programs and prevention.  *Id.*  A brief mention in a speech of one of Jordan's 11 victims hardly establishes that the death penalty was sought against Jordan out of vindictiveness for him exercising his right to proceed to trial.

Jordan also asserts that the United States did not follow its internal death penalty protocol as delineated in the Justice Manual.  *See* Doc. # 2424 at 7-8.  He notes that by virtue of the Department's internal protocol, that the United States is prohibited from seeking or threatening to seek a death sentence for obtaining a more desirable negotiating position.  He also argues that the United States made an "unprecedented" decision to reverse course and choose to seek the death penalty against Jordan.  Jordan offers no facts to support either claim, but instead makes the conclusory statement that "[t]he Government's disregard of [Department] protocol, and its reversal of its initial "no-seek" decision, appear tainted [by] a desire to punish him for not pleading guilty." *See* Doc. # 2424 at 8.

Such bare allegations do not establish a claim of vindictive prosecution.  Jordan has not alleged any facts which demonstrate that the United States used the threat of a death sentence to

obtain a more desirable negotiating position or that it is currently using the decision to seek the death penalty to that end.  Further, the United States did not violate its internal policies with respect to the death penalty decision concerning Jordan.  In fact, given that additional capital charges were alleged against Jordan, the United States was obligated by its own policy to submit all capital-eligible charges for review and consideration.  *See* J.M. § 9-10.010.

Application of the Justice Manual policies and procedures to Jordan cannot serve as the basis for a selective prosecution claim.  The Justice Manual itself provides:

> The Justice Manual provides internal DOJ guidance.  It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.  Nor are any limitations hereby placed on otherwise lawful litigation prerogatives of DOJ.

J.M. § 1-1.200.  The Eighth Circuit has ruled that the Department's death penalty protocol does not create substantive or procedural rights enforceable by individuals.  *United States v. Lee*, 274 F.3d 486, 493 (8th Cir. 2001).  To the extent Jordan attempts to use a violation of internal policy as evidence of vindictiveness, rather than as the source of a substantive right, that attempt fails as the United States has not used the death penalty decision to obtain a more desirable negotiating position, nor has it disregarded the requirements of the death penalty protocol.

Finally, Jordan attempts to bolster the absence of any objective evidence of vindictiveness by referencing a New York Times article which has no bearing on the legal question at issue here. The article discussed allegations against certain personnel at the Department's Capital Case Section (CCS).  Jordan does little to tie the article to his claim of selective or vindictive prosecution, claiming merely that "[t]he government's reversal, and its ultimate decision to see a death sentence, occurred in a professional atmosphere permeated by favoritism, bias, and sexual misconduct."  *See* Doc. # 2424 at 8.  Jordan fails to provide a nexus between this allegation and his claim that the death penalty was sought against him for exercising his constitutional right to a

16

jury trial.  Further, he makes several factual misrepresentations concerning this allegation.

His statement that "in the wake of [the New York Times article], defense counsel were asked to return to Washington D.C. to meet with the newly reconstituted Capital Case Section," contains two factual errors.  First, the implication that defense counsel returned to Washington D.C. as a result of the New York Times article is false.  Jordan has provided no facts or evidence to support this claim.  Defense counsel participated in three meetings with the Attorney General's Review Committee on Capital Cases.  The second meeting occurred on January 22, 2018.  As a follow-up to that meeting, defense counsel sent a letter concerning additional medical and psychological testing being performed, which counsel hoped to have considered as mitigating evidence.  *See* Exhibit B, Defense letter dated March 29, 2018[3].  The third meeting, the only one to occur after the April 1, 2018 New York Times article, was held at defense counsel's request with the purpose of allowing defense counsel to fully explore mental health and acceptance of responsibility mitigation evidence.  The New York Times article had no bearing on the holding of the third meeting and certainly was not the cause of that meeting.

Second, Jordan's assertion that he was meeting with the "newly reconstituted" Capital Case Section is also inaccurate.  CCS does not grant or deny authorization to seek the death penalty.  That decision lies solely with the Attorney General.  *See* J.M. § 9-10.050 ("The Attorney General will make the final decision whether to seek the death penalty.")[4]  Indeed, although there is a requirement of consultation with CCS to "streamline the process of preparing submissions made pursuant to this Chapter, ensure that charging documents are crafted in accordance with applicable

---

[3] Any information concerning the results of any testing have been redacted from the letter.

[4] There is one narrow exception to this rule found in J.M. § 9-10.160(B), which only applies in a circumstance where the death penalty will *not* be sought.  However, that set of circumstances was not applicable in the instant case.

legal and policy requirements, and help ensure that applicable deadlines are met" (*see* J.M. § 9-10.040), it is the Attorney General's Review Committee on Capital Cases (hereinafter the Committee) who makes recommendations to the Attorney General about seeking or not seeking the death penalty in a particular case, not CCS.  *See* J.M. § 9-10.130.[5]  It is also the Committee with whom the defense meets to present mitigating evidence.  *See id.*  "The Capital Review Committee is composed of attorneys from the Office of the Deputy Attorney General and the Office of the Assistant Attorney General for the Criminal Division (AAG CRM), and at-large prosecutors from the United States Attorneys' Offices and other Department components."  *Id.*  Although the CCS chief has typically been a member of the Capital Review Committee as an at-large prosecutor, not every member of the Capital Review Committee sits on every case and the CCS chief did not sit as a member of the Committee on Jordan's case.  Therefore, Jordan's counsel came to Washington, D.C. on three occasions not to meet with CCS, but rather to meet with the Committee to present mitigation information for the Committee's consideration.[6]

Third, his allegation that CCS was "newly reconstituted" is also inaccurate.  Although, as referenced in the New York Times article, there had been personnel changes within CCS, such personnel changes can hardly be described as a "reconstitution" of the section.  CCS continued to operate as normal both before and after the New York Times article and any personnel changes, just as any Department section continues to operate despite the usual attrition and personnel changes which occur in any large organization.

Jordan's attempt to bootstrap the New York Times article into his argument appears

---

[5] There is a narrow exception to this proposition found in J.M. § 9-10.070(B) for cases which meet limited criteria set forward in J.M. § 9-10.070(A)(1)-(3), none of which applied to the instant case.

[6] The meeting is administratively staffed by CCS, typically including the CCS chief who helps facilitate the meeting, at least one administrative support person, and a CCS attorney.

nothing more than an attempt to distract the Court from the legal standard at issue in deciding this matter, or perhaps an attempt to bias the Court against the United States by citing to salacious information published in a newspaper article.  The allegation has no bearing on Jordan's assertion that he is being vindictively prosecuted for exercising his right to proceed to trial and certainly does not constitute objective evidence of vindictiveness.

> (2) *Jordan has failed to establish sufficient evidence to warrant a presumption of vindictive prosecution*

Absent objective evidence, "a defendant may, in *rare* instances, rely upon a presumption of vindictiveness."  *Kriens*, 270 F.3d at 602 (emphasis added).  As noted above, to do so Jordan would have to establish that "a reasonable likelihood of vindictiveness exists."  *Goodwin*, 457 U.S. at 373.  As the Eighth Circuit has explained:

> To determine whether the presumption of vindictiveness applies, the court must examine the prosecutor's actions in the context of the entire proceedings.  Because a vindictive prosecution claim asks a court to exercise judicial power over a special provide of the President and his delegates to enforce the law, the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.

*Chappell*, 779 F.3d at 880 (internal quotation marks and citations omitted).  The circumstances of this case do not give rise to a reasonable likelihood that additional charges were sought against Jordan vindictively, nor that the decision to seek the death penalty was sought against him vindictively.

In this case, the United States sought four superseding indictments.  In each of the superseding indictments, additional defendants facing both capital and non-capital charges were added to the case, and additional charges were added against more defendants than just Jordan.  In the Third Superseding Indictment (Doc. # 391), a new capital charge was added against Derrick Terry, who was originally charged with a non-capital offense in the Second Superseding

Indictment (Doc. # 244).  In the Fourth Superseding Indictment (Doc. # 679), capital charges were added to already-existing charges against Adrian Lemons, Maurice Woodson, and Gloria Ward. As the Supreme Court has said, "initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution." *Goodwin*, 457 U.S. at 382.  Such was the case here.  The fact that multiple defendants were added to the case, and charges were amended for several defendants, including the death-eligible defendants described here, demonstrates that the superseding indictments in the case were the result of the ongoing investigation into the large narcotics conspiracy at the heart of this criminal prosecution.

A pre-trial presumption of vindictiveness is rarely appropriate because "[i]n the course of preparing a case for trial, the prosecutor  may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance.  At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized." *Id.* at 381.  Here, the United States' investigation was clearly ongoing and resulted in the identification of more information and evidence which resulted in new charges against Jordan, and many other defendants.  Indicting Jordan on new charges was not an act of vindictiveness but the result of the development of the case.  In the face of the circumstances of this case, Jordan cannot succeed in establishing the rare instance where a presumption of vindictiveness applies.

Similarly, the decision to seek the death penalty cannot be said to be vindictive here where the progress of the case shows that Jordan went from facing charges in the murders of three people, to facing charges in the murders of 11 people.  As demonstrated by the other instances of violence cited to in the United States' notice of intent to seek the death penalty, Jordan was also implicated in multiple additional instances of violence.  Terry, Lemons, Woodson and Ward are also an

effective comparison in demonstrating that Jordan has failed to establish that the death penalty was sought against him vindictively.  Prior to the death penalty decision being made, Terry, Lemons, Woodson and Ward were, just like Jordan, "exercising" their right to proceed to trial in the only sense that Jordan can be said to use that phrase in his motion[7]; i.e. they had not pleaded guilty to all charges. Yet, the death penalty was not sought against Terry, Lemons, Woodson and Ward (*see* Doc. # 1289).  In fact, as of this filing, Woodson and Thompson have not pleaded guilty and have retained their right to proceed to trial.  This fact negates any inference that could be drawn that the decision to seek the death penalty against Jordan was exercised to punish him seeking to proceed to trial since it was not sought against others who were also exercising that right.

Jordan has failed to establish objective evidence, or a presumption, that the prosecution acted vindictively against him for exercising his right to proceed to trial by bringing additional charges against him or by seeking the death penalty against him.

## II.   JORDAN IS NOT ENTITLED TO DISCOVERY OR AN EVIDENTIARY HEARING

Jordan is not entitled to discovery or to an evidentiary hearing concerning his claims.  To establish a right to discovery on an independent claim of government misconduct outside the scope of Rule 16(a)(1)(E)(i), a defendant must make a credible showing that the violation occurred in the first instance.  *See United States v. Bass*, 536 U.S. 862, 862 (2002) (*per curiam*) (applying the standard to a claim of discriminatory prosecution).  "[T]he mere allegation of selective prosecution does not require discovery or an evidentiary hearing."  *United States v. Jacob*, 781 F.2d 643, 646 (8th Cir. 1986), citing *United States v. Catlett*, 584 F.2d 864, 865 (8th Cir. 1978).  "A hearing is

---

[7] As noted above, Jordan's assertion in this regard is missing the usual accompanying allegation of a precipitating event wherein he exercised his right to a trial and which caused the alleged ill will of the prosecutor.

necessitated only when the motion alleges sufficient facts to take the question past the frivolous state and raises a reasonable doubt as to the prosecutor's purpose." *Catlett*, 684 F.2d at 866 (citations omitted); *see also In re U.S.*, 397 F.3d 274, 284 (5th Cir. 2005) ("Before a criminal defendant is entitled to any discovery on a claim of selective prosecution, he must make out a prima facie case.").  "The justifications for a rigorous standard for the elements of [a selective prosecution claim] thus require a correspondingly rigorous standard for discovery in aid of it." *Armstrong*, 517 U.S. at 468.

Further, Jordan's desire for additional discovery regarding the Department's decision to seek the death penalty against Jordan and not to seek against other defendants seeks privileged information.  The Justice Manual states that:

> The prosecution memoranda, death penalty evaluation forms, non-decisional information forms and any other internal memoranda informing the review process and the Attorney General's decision are not subject to discovery by the defendant or the defendant's attorney.

J.M. § 9-10.080.  Consistent with these provisions, courts have consistently recognized the privileged nature of such material.  *See*, *e.g. United States v. Fernandez*, 231 F.3d 1240, 1247 (9th Cir. 2000); *United States v. Perez*, 222 F. Supp. 2d 164, 172-3 (D. Conn. 2002); *United States v. Edelin*, 134 F. Supp. 2d 59, 89 (D.D.C. 2001).  Such documents are deliberative, in that they "contain[ ] opinions, recommendations, or advice about agency policies." *Fernandez*, 231 F.3d at 1246 (internal quotations omitted).

Jordan has failed to make a prima facie case establishing both elements of his vindictive prosecution claim.  As such, he is not entitled to discovery or an evidentiary hearing.  The Fifth Circuit reversed a district court's decision granting discovery on a selective prosecution claim in a death penalty case where the defendant failed to establish the requisite *Armstrong* showing, and because the defendant conceded he needed the discovery to make out a prima facie case.  *In re*

*U.S.*, 397 F.3d at 284-85.  Here, Jordan offers no argument to support his request for discovery or an evidentiary hearing.  However, as established above, he has failed to meet his burden on either prong of the *Armstrong* test and therefore, his request for discovery and an evidentiary hearing should be denied.

## **CONCLUSION**

Based on the foregoing, the United States respectfully requests the Court deny Jordan's Motion to Dismiss the Indictment Based on Selective and Vindictive Prosecution or in the Alternative Strike the Notice of Intent to Seek the Death Penalty or Provide the Defendant with Additional Discovery Regarding the Decision to Seek the Death Penalty (Doc. #s 2423 & 2424).

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney


/s/ Sonia V. Jimenez
SONIA V. JIMENEZ, #8818NV
Trial Attorney
United States Department of Justice
Criminal Division, Capital Case Section
1331 F. Street, N.W., 6th Floor
Washington, D.C. 20530
(202) 616-2514


/s/ Thomas Rea
THOMAS REA, #53245MO
ERIN GRANGER, #53593MO
Assistant United States Attorneys
111 S. 10th Street, 20th Floor
St. Louis, Missouri  63102
(314) 539-2200

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on November 21, 2019, a true and accurate copy of the foregoing was filed via the Court's electronic filing system upon all parties of record.

/s/ Sonia V. Jimenez_____
SONIA V. JIMENEZ, #8818NV