UNITED SATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. S5-4:15 CR 404 HEA (NAB) |
| | ) | |
| v. | ) | |
| | ) | |
| ANTHONY JORDAN (3), | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES OF AMERICA'S**
**RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

COMES NOW the United States of America and states as follows in opposition to Defendant Anthony Jordan's motion to suppress evidence (Doc. # 3212):

**INTRODUCTION**

Defendant's request to suppress evidence seized from 4223 West Sacramento, 4217 East Sacramento, 64 Brighton Park Drive, a 2005 Pontiac Grand Prix, a 2004 Pontiac GTO Coupe, a 2004 Chevrolet Silverado SS, and fifteen (15) digital devices should be denied in its entirety. This is particularly true because probable cause supported every action undertaken by officers throughout the investigation of Defendant, and each search warrant obtained by officers from magistrate judges within this district was based upon the existence of probable cause.

Defendant specifically argues that officers searched the 4223 West Sacramento residence without a valid search warrant. Defendant notes that the search warrant authorized officers to search 4223 East Sacramento, not 4223 West Sacramento.

Defendant also maintains the search warrant is not protected by the good faith exception to the exclusionary rule and was improperly returned.  Further, Defendant argues that that the probable cause set out in the search warrant affidavits for both 4223 West Sacramento and 4217 East Sacramento was stale.

Defendant's arguments must fail as officers had probable cause to search the residences at 4223 West Sacramento and 4217 East Sacramento.  Both warrants established that there was a fair probability that evidence of a crime would be found at the time the search warrants were authorized.  Although the return was delayed, the officers did not intentionally or deliberately disregard Federal Rule of Criminal Procedure Rule 41, and Defendant was not prejudiced by the late return.

Defendant next asserts that the officers' protective sweep of 64 Brighton Park Drive was overbroad and the search warrant for that property lacked probable cause.  Defendant argues that the Brighton Park warrant failed to authorize the seizure of the 2005 Pontiac Grand Prix and the subsequent search of that vehicle was the fruit of the poisonous tree. Defendant also challenges the search and seizure of a 2004 Pontiac GTO Coupe and a 2004 Chevrolet Silverado SS, which were seized from a vehicle repair business.  Defendant argues that these vehicles were seized without a warrant and that the business' employees lacked authority to consent to the seizure of these vehicles.  Moreover, Defendant claims that any search warrants for these vehicles were the fruit of the poisonous tree or, alternatively, lacked probable cause.

Defendant's arguments must fail as officers were justified in conducting a protective sweep of 64 Brighton Park and the subsequent search warrant for 64 Brighton Park was

supported by probable cause.  Similarly, officers had probable cause to seize the Grand Prix, GTO Coupe, and Chevrolet Silverado and secure each vehicle until a federal search warrant was ultimately issued because each vehicle was evidence of Defendant's crimes. Further, a review of each search warrant issued clearly establishes that there was a fair probability that evidence of a crime would be found within the Grand Prix, GTO Coupe, and Chevrolet Silverado at the time the search warrants were authorized.

Finally, Defendant argues that officers violated Federal Rule of Criminal Procedure 41 because the officers delayed in executing the warrant for 15 digital devices.  Defendant also states that the warrant affidavit included an error and requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  Broadly speaking, Defendant alleges the affidavit included a deliberately false or reckless statement and omitted a truthful statement that was purportedly critical to the finding of probable cause.

Defendant's arguments must fail as officers did not intentionally or deliberately disregard Rule 41 when they searched the digital devices.  That search warrant was supported by ample probable cause, and Defendant's attacks within the four corners of the search warrant are meritless.  Finally, Defendant has failed to make a sufficient showing to warrant an analysis of the affidavit pursuant to *Franks*.  Accordingly, this Court should deny Defendant's request.

**ARGUMENT**

**I.   SEARCH OF 4223 WEST SACRAMENTO AND 4217 EAST SACRAMENTO**

**A.   Relevant Facts**[1]

On June 22, July 21, and July 30, 2015, officers received information from a cooperating witness (CW) who provided detailed information on Defendant's criminal activity and Defendant's utilization of various addresses and vehicles which were actual evidence of Defendant's crimes and/or concealed evidence of these crimes.[2]  On August 6, 2015, Drug Enforcement Administration Task Force Officer Eric Lanham (TFO Lanham) presented a search warrant to United States Magistrate Judge David D. Noce for the residence at 4223 West Sacramento, St. Louis, Missouri.  Despite the search location inadvertently being referred to as "East Sacramento" in the search warrant documentation, TFO Lanham specifically described and attached to the affidavit and warrant a photograph of the 4223 West Sacramento residence to be searched.  TFO Lanham also included a detailed description of the 4223 West Sacramento residence in the affidavit and caption of the search warrant.  A true and accurate copy of the 4223 West Sacramento search warrant documentation is submitted herewith as **Exhibit 1** and incorporated herein by this reference.

---

[1]   The background and factual information provided throughout this response is intended as a summary only and general guide to aid the Court.  It is not intended as a comprehensive statement of the government's case, nor is the United States limiting itself to the evidence or assertions made herein.

[2]   Each reference to CW throughout this pleading refers to the same cooperating individual.

That same day, TFO Lanham also presented Judge Noce with a search warrant for a garage located at 4217 East Sacramento, St. Louis, Missouri.  TFO Lanham attached a photograph of that garage to the affidavit and search warrant and provided a detailed description of the garage in the affidavit and caption of the search warrant.  A true and accurate copy of the 4217 East Sacramento search warrant documentation is submitted herewith as **Exhibit 2** and incorporated herein by this reference.

Judge Noce authorized both warrants.  On August 7, 2015, officers executed the warrant at 4223 West Sacramento.  This address matched the description of the property in the search warrant; was, in fact, the property depicted in the photograph; and the intended target of the search warrant.  Officers also executed the warrant on the garage located at 4217 East Sacramento.

At 4223 West Sacramento, officers seized *inter alia,* human hair braids, a box of paper face masks, fourteen (14) cellular telephones, twelve (12) firearms, ammunition, and $4,469.  At 4217 East Sacramento, officers seized ammunition, two vehicles, gloves, and other items.   Officers filed returns for the 4223 West Sacramento and 4217 East Sacramento search warrants on October 19, 2015.

**B.      Opposition**

      **1.      The 4223 West Sacramento search warrant described the premises with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort, and there was no reasonable probability that another premise might be mistakenly searched.**

Defendant claims that the search of the 4223 West Sacramento residence was unlawful because the search warrant authorized a search for the residence located at 4223

*East* Sacramento, not 4223 *West* Sacramento.   However, the warrant specified with particularity that 4223 West Sacramento was the place to be searched.   This enabled the executing officer to locate and identify the premises with reasonable effort and there was no reasonable probability that another premise might be mistakenly searched. Accordingly, Defendant's motion should be denied.

The test for determining the sufficiency of the description of the place to be searched is whether the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort and whether there is any reasonable probability that another premise might be mistakenly searched. *United States v. Gitcho,* 601 F.2d 369 (8th Cir. 1979).   Where a search warrant contains information that identifies a place to be searched, courts have found that description to be sufficient even when the warrant lists the wrong address.   *United States v. McCain*, 677 F.2d 657 (8th Cir. 1982).

Defendant maintains that the search of 4223 West Sacramento was warrantless because the officers who executed the warrant were familiar with the area and knew that the warrant only authorized a search of 4223 East Sacramento.   As support for this argument, Defendant relies on *Maryland v. Garrison*, 480 U.S. 79 (1987).   Defendant's reliance on *Garrison* is misplaced.

In *Garrison,* officers secured a search warrant for the third floor of 2036 Park Avenue.   At the time the officers obtained and executed the warrant, they believed that the third floor encompassed an apartment which was occupied by an individual named McWebb.   Officers discovered narcotics in a location they later learned was a separate

apartment on the third floor, occupied by Garrison.  Garrison challenged the search as unlawful because the search warrant did not authorize the search of both apartments on the third floor.  The Supreme Court noted that the Fourth Amendment prohibits the issuance of any warrant except one "particularly describing the place to be searched and the persons or things to be seized."  *Id.* at 84.  The Court explained that the purpose for this particularity requirement was to prevent general searches and ensure that a search is "tailored to its justifications and will not take on the character of the wide-ranging exploratory searches." *Id.*   The Court noted however, that courts must look at the conduct in light of the information known at the time the officers acted.  The Court found that the objective facts available to the officers at the time demonstrated there was no distinction between an apartment and the third-floor premises.  Therefore, the officers' conduct was "consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment."  *Id.* at 79.

The Court also explained that, if the officers had known there were two separate dwellings, they would have been excluded in searching Garrison's apartment because they did not have probable cause to search that apartment.  However, the officers were operating under a mistaken belief that was reasonable at the time the search warrant was signed and executed.  *Id.* at 85.

Defendant's situation here is distinguishable from *Garrison* because the officers had probable cause to search 4223 West Sacramento.  Therefore, the concerns raised in *Garrison* are not present here.  Officers searched the correct address and only made a

mistake on one part of the address; "East" should have been written as "West." Courts have upheld searches of residences where there were far greater discrepancies in addresses.

For example, in *Lyons v. United States*, 783 F.2d 737 (8th Cir. 1985), although officers obtained a search warrant for 325 Atkinson Street, the correct address was 325 Short Street. The warrant described the location to be searched as a single residence with silver siding and red trim. This description matched the actual property at 325 Short Street. The defendant argued that the search was improper, but the Court disagreed and found that the inclusion of an incorrect address was not significant. Instead, the Court explained that the warrant specified with particularity the place to be searched. Specifically, the warrant was not misleading or confusing and the warrant provided an accurate physical description of the premises. *Id.* at 738. The Court found that the officer "obviously mistakenly read the street sign" and received assurance that a mistaken search was unlikely since the same officer applied and executed the search warrant. As a result, the Court declined to apply the harsh remedy of suppression when the officer merely made a mistake. *Id.*

In *Gitcho*, the Court found that there was no Fourth Amendment violation where one part of the description of the premises to be searched was inaccurate but other parts of the description identified the place to be searched with particularity. 601 F.2d at 371. There, the officers obtained a search warrant for an apartment address which did not exist, but the officers had the premises of the correct apartment under surveillance. The district court suppressed the evidence and found a Fourth Amendment violation. The Eighth Circuit reversed finding that the search did not violate the Fourth Amendment. Where one part of the description of the premises to be searched is inaccurate, but the description has

other parts which identify the place to be searched with particularity, searches pursuant to such warrants have been routinely upheld. *Id.* (*citing United States v. Shropshire,* 498 F.2d 137 (6th Cir. 1974); *United States v. Smith,* 462 F.2d 456, 460-461 (8th Cir. 1972); and *Hanger v. United States*, 398 F.2d 91, 98-99 (8th Cir. 1968), cert. denied, 393 U.S. 1119 (1969)).  In reaching its conclusion, the Court specifically noted that the agents executing the warrant personally knew the specific premises intended to be searched and that specific premises was in fact searched.

Other courts have adopted the reasoning in *Lyons* and *Gitcho* and upheld searches where the search warrant listed an incorrect address.  *See United States v. Ross*, 2018 WL 3091623 (N.D. Ia. April 11, 2018) (upholding search of vehicle where wrong license plate number was listed because the warrant contained sufficient particularity describing the vehicle to be searched and there was no probability that the incorrect vehicle would be searched); *United States v. Thurman*, 625 F.3d 1053, 1057 (8th Cir. 2010) (upholding search warrant listing wrong street number but accurately describing the house and its location); *United States v. Strusinski*, 2013 WL 6276380 (D. Minn., December 4, 2013) (wrong address listed in one location of the warrant did not destroy probable cause where warrant contained probable cause to search the correct location).

Defendant argues that officers should have been aware that that Sacramento Avenue was divided into West and East sections.  Defendant claims that, because officers were also executing a warrant at 4217 East Sacramento, they should have realized that 4223 West Sacramento was several blocks away.  Defendant asserts that this omission by the officers supports a finding that officers did not take reasonable steps to ensure that they were

searching the correct property.  Defendant's argument is incorrect because officers, in fact, searched the correct property.  Likewise, although the warrant incorrectly listed 4223 East Sacramento as the address to be searched, the officers had probable cause to search 4223 West Sacramento.   Thus, this search is not analogous to *Garrison* where the officers searched the wrong property, and *Garrison* does not provide Defendant with relief.  Indeed, Defendant has not cited a single case where a court has held that a typographical mistake in location on a warrant deems that warrant unreasonable when the place to be searched is actually described with particularity.

The affidavit and warrant described with particularity the location to be searched as to enable the executing officer(s) to locate and identify the premises.  Specifically, the warrant described the property as:

> a two-story, two-family residence, with a chain link fence around the front yard.  The building consists of a red brick construction and white bordered windows.  Each residence has a white door, next to each door is a brown wooden area with a mailbox and numeric affixed above the mailbox.  The target address is the furthest to the west. [See Attachment A] (**Exh. 1**).

Attached to the affidavit and warrant as Attachment A was a photograph of the premises of 4223 West Sacramento (**Id.**).  The detailed description accurately depicted the premises of 4223 West Sacramento.  The 4223 West Sacramento residence is a completely different looking structure than the 4223 East Sacramento property.   A true and accurate photographic comparison of the properties at 4223 West and 4223 East Sacramento is attached hereto as **Exhibit 3** and incorporated herein by this reference.

Furthermore, at least two individuals identified the correct property to be searched. TFO Lanham, the affiant, observed 4223 West Sacramento and was familiar with the property.  Additionally, CW also positively identified the property to be searched.

Lastly, TFO Lanham was the officer who applied for and was present during the execution of it.  *See McCain*, 677 F.2d 657 (stating a mistaken search is unlikely where the same officers both apply for and execute the warrant).  TFO Lanham had personal knowledge that the premises at 4223 West Sacramento were intended to be searched and that those premises were in fact searched (not 4223 East Sacramento).  As a result, there was no reasonable probability that another premise might be mistakenly searched, and Defendant's argument fails.

> **2.    Officers executing the 4223 West Sacramento search warrant acted in good faith**.

Any evidence obtained as a result of the search warrant is protected by the good faith exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897 (1984).  It has long been established that when law enforcement officers, acting in good faith, rely upon a search warrant issued by a detached and neutral magistrate that turns out to be lacking in probable cause or contained some other technical defect, the evidence need not be excluded.  *Leon*, 468 U.S. 897; *Massachusetts v. Sheppard*, 468 U.S. 981 (1984).  "Under the good-faith exception, evidence seized pursuant to a search warrant later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable."  *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015). This "good-faith inquiry is confined to the objectively ascertainable question of whether a

reasonably well-trained officer would have known that the search was illegal despite the" court's authorization of the warrant. *United States v. Clay*, 646 F.3d 1124, 1127 (8th Cir. 2011).

In *Leon*, the Supreme Court stated, "[w]e conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." The Court permitted the admission of evidence from a subsequently invalidated search warrant because the officer relied in good faith on the search warrant. In *United States v. Lindsey,* 284 F.3d 874, 878 (8th Cir. 2002), the Eighth Circuit held:

> The good faith exception will not apply if: (1) the judge issuing the warrant was misled by statements that the affiant knew were false or would have known were false except for "his reckless disregard of the truth;" (2) "the issuing magistrate wholly abandoned his [or her] judicial role;" (3) the affidavit is support of the warrant is "so lacking in indicia or probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant is "so facially deficient... that the executing officers cannot reasonably presume it to be valid."

*United States v. Curry,* 911 F.2d 72 (8th Cir. 1990) extended *Leon* and upheld searches conducted pursuant to warrants which lacked a description of the premises to be searched. When evaluating whether officers relied in good faith on a warrant containing inaccurate information affecting particularity, the Eighth Circuit has found relevant that the officers executing the warrant personally knew which premises was intended to be searched, that the premises was under constant surveillance, and that the premises which was intended to be searched was in fact the premises searched. *Gitcho*, 601 F.2d at 371;

12

*see also United States v. Thomas,* 263 F.3d 805 (8th Cir. 2001) (upholding a warrant which contained an incorrect address because the officer "who had personal knowledge of the location to be searched, both obtained and executed the warrant, but also by the fact that the intended location was under surveillance while he secured the warrant.")

Here, TFO Lanham personally identified the residence at 4223 West Sacramento. On July 21, 2015 -- two weeks before the affidavit was presented to Judge Noce -- officers working with TFO Lanham traveled with CW to identify the residence at 4223 West Sacramento. Following that identification, TFO Lanham visually reconfirmed the location of the relevant residence to be searched at 4223 West Sacramento. Moreover, TFO Lanham possessed the search warrant along with the photograph of 4223 West Sacramento attached to the warrant which further ensured that TFO Lanham was executing the warrant on the correct address he had previously surveyed. Likewise, the officers who traveled with CW to identify the residence at 4223 West Sacramento were part of the search warrant's execution team who similarly ensured that TFO Lanham was executing the search warrant at the correct address. TFO Lanham's reliance on the warrant was objectively reasonable.

Defendant asserts that *United States v. Herron*, 215 F.3d 812 (8th Cir. 2000), is analogous to Defendant's case. It isn't. Defendant's argument ignores critical differences between Defendant's case and the conduct in *Herron.* In *Herron*, the United States conceded that the search warrant was not supported by probable cause. The warrant articulated probable cause to search a premise for controlled substance but contained no probable cause that any evidence would be found at Herron's residence. *Id.* at 813. In fact, the *Herron* Court rejected the good faith argument. The Court noted that the affidavit did

not provide any evidence of illegal activity at Herron's residence and a reasonable officer could not believe the facts established probable cause to search the residence.  The Court also explained that, "[t]he problem is not a technical legal deficiency; the affidavits simply do not say very much about Mr. Herron or his residence."  The issue in *Herron* was not a mistake in the warrant; it was a lack of probable cause for the warrant.  No such problem exists here because officers had ample probable cause to search 4223 West Sacramento. Thus, *Herron* is not applicable and provides Defendant no basis for relief.

> **3.      Officers did not deliberately disregard Federal Rule of Criminal Procedure 41, and Defendant was not prejudiced by a delay in the search warrant's return.**

Federal Rule of Criminal Procedure 41(e)(2)(A)(i) provides that a search warrant must be executed "within a specified time no longer than 14 days."  Rule 41(f)(1)(D) requires that the warrant and a copy of the inventory of seized items must be returned promptly to the issuing judge.   Noncompliance with Rule 41 however, does not automatically require evidence to be suppressed.  *United States v. Schoenheit,* 856 F.2d 74 (8th Cir. 1988).  Suppression of evidence is proper only where "(1) 'there was prejudice in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed,' or (2) 'there is evidence of intentional or deliberate disregard of a provision in the rule.'" *United States v. Burgard*, 551 F.2d 190, 193 (8th Cir. 1977) (*quoting United States v. Burke*, 517 F.2d 377, 386-87 (2d Cir. 1975)).  Defendant argues that the warrant was not returned until October 19, 2015, which was ten weeks after execution.  There is no evidence -- and Defendant has not identified any -- that the officers

intentionally or deliberately disregarded Rule 41 or that the delayed return has prejudiced Defendant in any way.

Defendant is entitled to no relief because of the delay in the search warrant's return. In *United States. v. Anderson*, 851 F.2d 384, 390 (D.C. Cir. 1988), the court held that "technical defects in [a] … warrant d[o] not implicate in any way the essential requirements for a valid federal search warrant." A failure to comply with Rule 41 does not automatically justify exclusion of evidence absent a showing of prejudice or evidence of intentional and deliberate disregard of the rule. *See Schoenheit,* 856 F.2d at 77.

Additionally, in *United States v. Beckmann*, 786 F.3d 672 (8th Cir. 2015), officers executed a search warrant in 2011 but did not return the warrant until 2013. The Court held that the two-year delay did not justify exclusion of evidence because there was no reckless disregard for proper procedure. The Court noted that the trial court found the delay was due to inadvertence as opposed to a deliberate and intentional disregard for the rules. Further, the defendant did not argue sufficient prejudice to justify the exclusion of evidence. *Id.* at 681; *see also United States v. Barnes*, 2019 WL 2353659 (D. Minn. June 4, 2019).

To determine prejudice, a court must determine "whether the search would have occurred had the rule been followed. If so, there is no prejudice to the defendant." *United States v. Hyten*, 5 F.3d 1154, 1157 (8th Cir. 1993). There is no question the search of 4223 West Sacramento, as well as 4217 East Sacramento discussed below, would have occurred. Defendant cannot demonstrate that the delay in the return prejudiced him in any way. The return detailed all of the evidence seized from 4223 West Sacramento. The delay in return

does not affect Defendant's knowledge of what was seized. It also does not affect Defendant's ability to challenge the seizure of those items. Testimony at the evidentiary hearing will establish that there was no intentional, deliberate, or reckless disregard of Rule 41. The return delay was not unreasonable, and Defendant has not been prejudiced by the delay. Therefore, Defendant's motion should be denied.

### 4. The 4223 West Sacramento and 4217 East Sacramento search warrant affidavits were not stale, and there was a fair probability that evidence of a crime would be found at each residence.

#### (a) The affidavits contained sufficient probable cause.

The Fourth Amendment requires that a neutral and detached judicial officer determine whether law enforcement officers have probable cause to conduct a search. *Warden v. Hayden*, 387 U.S. 294, 301-02 (1967). Probable cause is the level of suspicion required to justify certain governmental intrusions upon interests protected by the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 479 (1963). The issuing judge's task is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (*quoting Illinois v. Gates*, 462 U.S. 213, 238 (1983)); s*ee also United States v. Terry*, 305 F.3d 818, 822 (8th Cir. 2002) (when the affidavit supporting the search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched, probable cause exists).

"Whether a warrant is supported by probable cause is a legal determination and is based on whether the warrant is supported by facts that would justify a prudent person in

the belief that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Thurmond*, 782 F.3d 1042 (8th Cir. 2015) (internal quotations omitted).  Once a judicial officer has issued a warrant based upon a finding of probable cause, that finding deserves great deference if there is a substantial basis for the finding.  *Gates*, 462 U.S. at 236; *United States v. Kattaria*, 553 F.3d 1171, 1175 (8th Cir. 2009); *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008).  This Court's duty "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Keele*, 589 F.3d 940, 943 (8th Cir. 2009).  "Probable cause requires only a showing of fair probability, not hard certainties."  *Hudspeth*, 525 F.3d at 676.  In *Hudspeth*, the defendant challenged search warrants and argued the warrants were not supported by probable cause.  *Id*.  The Court rejected the challenge and concluded that the affidavits demonstrated "a fair probability of finding evidence of a crime."  *Id*.  The Court used a "common-sense approach" and noted that probable cause is determined by considering the totality of the circumstances.  *Id.*

The search warrant affidavits for 4223 West Sacramento and 4217 East Sacramento demonstrate on their faces that Defendant's attack within the four corners is meritless.[3]

---

[3]     The determination of whether there is probable cause to support a search warrant is determined solely from a review of the four corners of the affidavit.  *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005); *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir.1999); *United States v. Wells*, 347 F.3d 280, 286 (8th Cir.2004); *United States v. Gladney*, No. 4:18CR320 AGF (PLC), 2019 WL 3955815, at *3 (E.D. Mo. Aug. 22, 2019); *United States v. Fisher*, No. 4:19CR80 CDP (SPM), 2019 WL 7708530, at *8 (E.D. Mo. Oct. 9, 2019), report and recommendation adopted, No. 4:19 CR 80 CDP, 2019 WL 5884437 (E.D. Mo. Nov. 12, 2019); *United States v. Massey*, No. 4:09CR506-DJS, 2009 WL 3762322, at *12 (E.D. Mo. Nov. 10, 2009).  Therefore, no additional information or evidence will be presented to the Court on the probable cause issues raised by Defendant beyond what is contained in the search warrant documentation submitted herewith.

These search warrant affidavits were supported by ample probable cause, signed by a judge, and clearly not facially deficient.  Furthermore, even absent probable cause (which the United States contends was clearly established), any evidence obtained as a result of the search warrants would be protected by the good faith exception to the exclusionary rule under *Leon*.

The affidavits for 4223 West Sacramento and 4217 East Sacramento detailed the investigation into Defendant for violations of 21 United States Code, Section 841 and 18 United States Code, Sections 924(c) and 924(j) dating back to as early as 2013 (*see* **Exhs. 1**, **2**).  Specifically, both warrants set out how Defendant used the property at 4223 West Sacramento to store narcotics, firearms, money, and packaging for the distribution of narcotics.  Further, they explain how he used the garage at 4217 East Sacramento to store vehicles, firearms, and clothing used to conceal his identity.

The affidavits detail information provided by CW.  On June 22, July 21, and July 30, 2015, officers met with CW who was an associate of Defendant.  CW advised officers that he had supplied narcotics to Defendant and participated in shootings and murders with Defendant over multiple years.  CW described how Defendant's drug distribution worked and identified the residence of 4223 West Sacramento as a location where Defendant distributed drugs and possessed firearms.  CW was able to provide specific details about the layout of the residence, including a basement area where Defendant counted money on a pool table.  CW explained that Defendant regularly kept narcotics, narcotics-related

items, firearms, and currency inside the residence.  CW also described the garage at 4217 East Sacramento and advised officers that Defendant stored vehicles he utilized in murders within the garage.  Further, Defendant also stored firearms, masks, and gloves in that garage.

In the affidavits, CW provided specific details about shootings and murders that Defendant committed.  First, CW provided information about the June 25, 2013, murder of Anthony Clark.  CW advised that Defendant and "D" utilized an Audi vehicle to commit this murder.  He identified an AK-47 as the weapon Defendant used to murder Clark. Officers seized shell casings from the scene of Clark's murder which were consistent with being fired from an AK-47 rifle.  Following the murder, CW had an opportunity to use the Audi which had been painted a different color and secured at a separate location to avoid detection.

Second, CW offered details about the December 29, 2013 murders of Robert Parker and Clara Walker.  CW was present for these murders and explained that he and Defendant went to the garage at 4217 East Sacramento in preparation for committing the murders. Defendant and CW retrieved masks and gloves and entered into an Infiniti vehicle that was stored in the garage.  Defendant and CW were armed with an AR rifle and AK rifle.  They located Parker and began shooting at him.  They returned the vehicle to the garage after the murders and left the firearms inside the garage.  From shell casings retrieved at the location of the Parker and Walker murders, officers were able to confirm that an AR-style firearm was utilized.

Third, CW provided information about the January 21, 2014 murder of Michail Gridiron.  CW explained that he and Defendant retrieved the Infiniti vehicle from the garage at 4217 East Sacramento and drove it to Gridiron's residence.  Defendant and CW used an AK-47 and AR-15 rifle to shoot Gridiron and another individual. They then fled the scene and returned the Infiniti to the garage at 4217 East Sacramento.  From shell casings retrieved at the location of Gridiron's murder, officers were able to confirm that an AR-style firearm was utilized.

Finally, CW reported details about the March 5, 2014, murder of Dion Stovall. Defendant advised CW that he and "Tone Bone" murdered Stovall.  Once again, Defendant utilized the Infiniti vehicle during the shooting.  CW believed that the Audi and Infiniti vehicles were being held by an individual named "Vince" whom officers were able to associate with properties located in the 4200 block of East Margaretta.  Based upon CW's confirmed information, officers drove to the 4200 block of East Margaretta and observed vehicles consistent in appearance with the Infiniti and Audi described by CW.

The affidavits further set out the training, knowledge, and experience of TFO Lanham, including his knowledge and experience in firearms and drug trafficking investigations.  Specifically, the affidavits explain how individuals retain firearms.  If a firearm has been used in the commission of a crime, an individual is more likely to maintain possession of that firearm in a secure location, such as a residence.  Further, the affidavits detail characteristics of drug trafficking organizations and how drug traffickers secrete contraband, proceeds, and records in locations which they control.  These individuals also keep drug packaging material, records, photographs, and firearms in their residence.

20

The affidavits clearly provided a substantial basis to conclude that both the residence at 4223 West Sacramento and garage at 4217 East Sacramento had been sued for years and were continuing to be used in connection with federal crimes and there was a fair probability that evidence of those crimes would be found in the locations requested by the search warrants.  Consequently, the court had a "'substantial basis for…conclud[ing]' that probable cause existed" that evidence of the subject offenses would be obtained from the issuance of the search warrant.  *Gates*, 462 U.S. at 238-39 (*citing Jones v. United States*, 362 U.S. 257, 271 (1960) (overruled on other grounds)).

*(b)     The information in the affidavits was not stale.*

Defendant argues that the search warrants lacked probable cause because the information provided in the affidavits was stale.  There is no specific formula for determining when information has become stale.  *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2008); *United States v. Gleick*, 397 F.3d 608, 613 (8th Cir. 2005).  "The timeliness of the information supplied in an affidavit depends on the circumstances of the case, including the nature of the crime under investigation; the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated."  *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999);  *see also United States v. Morrison*, 594 F.3d 626, 631 (8th Cir. 2010) (where continuing criminal activity is suspected, the passage of time is less significant in determination of whether information supporting a search warrant is stale); *United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010) (lapse of time is least important when suspected criminal activity is continuing in nature and when the property is not likely to be

destroyed).  "[T]here is no bright-line test for determining when information is stale ... and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit."  *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (*quoting United States v. Koelling*, 922 F.2d 817, 822 (8th Cir. 1993)).

In *United States v. Lopez-Tubac,* 943 F. 3d 1156, 1159-60 (8th Cir. 2019), the Eighth Circuit reaffirmed its view of "staleness" as it relates to search warrants:

> As we have indicated before in the context of search warrant applications, "[t]here is no bright-line test for determining when information ... is stale," *United States v. Johnson*, 848 F.3d 872, 877 (8th Cir. 2017) (*quoting United States v. Lemon*, 590 F.3d 612, 614 (8th Cir. 2010)), but given the nature of the information, we do not think the two-month gap between the last sighting of the suspect's vehicle and Lopez-Tubac's arrest was sufficient to dissipate Callison's reasonable suspicion that the suspect lived at the residence, *see, e.g.*, *Lemon*, 590 F.3d at 614-15 (holding that information was not stale despite an eighteen-month gap between defendant's last known criminal act at his apartment and the police's application for a warrant to search the premises).  943 F. 3d at 1159-60.

Firearms cases particularly withstand staleness challenges to search warrants because possession of firearms in furtherance of drug trafficking and otherwise are continuing offenses.  *United States v. Maxim*, 55 F.3d 394 (8th Cir. 1995), *cert. denied* 516 U.S. 903 (1995) (holding information three years old may supply probable cause for a warrant to search the home of someone suspected of illegal possession of a firearm, because possession is a continuing offense, and because firearm enthusiasts tend to keep their weapons for long periods of time.)

In *Maxim*, the defendant challenged a warrant which authorized officers to search his residence for firearms and ammunition and argued that the information was stale because it was three years old. The Court rejected the defendant's argument and held that the information contained in the warrant was not stale. The Court noted that the lapse of time was not always the controlling factor. Instead, other factors must be considered including the nature of the criminal activity involved and the kind of property subject to the search. *Id.* at 397. The Court explained that firearms offenses are continuing offenses. Additionally, the Court found that the affidavit was supported by the affiant's statement that based on his experience, firearm enthusiasts tended to hold onto their firearms for long periods of time. Therefore, the totality of the circumstances demonstrated that there were sufficient facts to establish an objectively reasonable belief that probable cause existed to search the residence. *Id.*

Defendant's case is analogous to *Maxim.* Here, the affidavits detailed the ongoing firearms offenses in furtherance of drug trafficking and the commission of violent acts by Defendant with firearms.[4] The affidavits contained TFO Lanham's statement that, in cases where firearms are used in the commission of crimes, an individual is more likely to maintain possession of that firearm in a secure location, such as a residence. Moreover,

---

[4]    Throughout his suppression motion, Defendant challenges the officers' actions and the existence of probable cause on the ground that Defendant was not a previously convicted felon and, on that basis alone, any firearm possession by Defendant was legal. Not so. As the indictment makes clear, the possession of a firearm in furtherance of drug trafficking by anyone -- regardless of criminal history -- is illegal, making a firearm or firearm-related items evidence of a crime (*see* Doc. # 2; *see also* 18 U.S.C. § 924(c)); so is using a firearm to intentionally murder another person (*see* Doc. # 2; *see also* 18 U.S.C. § 924(j)).

CW provided officers with information that Defendant would return these firearms to the garage.

Defendant argues that the probable cause for the search warrants is stale because CW had been confined for a period of months and thus did not have knowledge that the properties were still being used in the commission of the offenses.  Defendant's arguments are without merit and belied by the affidavits.

First, CW's confinement does not disturb the continuing nature of the offenses, namely, Defendant's possession of firearms in furtherance of drug trafficking activity and the use of those firearms to commit violent acts, including murder over multiple years. Critically, Defendant ignores the holding in *Mathis* which clearly establishes that prior information may supply probable cause for a warrant because firearm possession in furtherance of drug trafficking is a continuing offense and individuals tend to retain firearms.  As support for his position, Defendant relies on *United States v. Kennedy*, 427 F.3d 1136 (8th Cir. 2006).  *Kennedy* is easily distinguishable from Defendant's case.  In *Kennedy*, the Court found that information provided by an individual who reported a defendant had dealt in methamphetamine was stale.  Critical to the Court's finding was that the individual who had provided information to officers gave no specific time frame for her knowledge.  *Id.* at 1141.  The Court also found notable that the defendant was not the subject of an on-going narcotics investigation.  *Id.* at 1142.

These two concerns for the *Kennedy* court are nowhere to be found in Defendant's case.  First, CW provided a time frame for his knowledge.  One week before the search warrant was signed, CW provided details to officers, including details about murders which

occurred in 2013 and 2014. CW gave sufficient details about each incident and when those incidents occurred. Additionally, CW advised officers the manner in which his and Defendant's drug distribution worked and that "Defendant utilizes [4223 West Sacramento] for drug distribution and firearm possession purposes" and "regularly" keeps narcotics, narcotics-related items, firearms, ammunition, and currency in this residence (**Exh. 1** at Affidavit (Aff.) p. 3). Likewise, CW observed vehicles Defendant had utilized in the murders stored within the 4217 East Sacramento garage. Further, he had seen Defendant store firearms, masks, and gloves in that garage.

Second, unlike the facts presented in *Kennedy*, Defendant was the subject of an on-going investigation. The affidavits for both 4223 West Sacramento and 4217 East Sacramento state that Defendant has been "under investigation by federal and state-level since as early as 2013 and had been identified as [a] multi-kilogram heroin distributor" (**Exh. 1** at Aff. p. 1; **Exh. 2** at Aff. p. 1). The affidavits present the investigation as an "active and on-going" investigation in which officers received information connecting Defendant to drug-related murders (**Id.**). Additionally, the affidavits identify CW as a long-term associate of Defendant's. The affidavits state that CW explained, "Defendant distributes multiple-kilogram quantities of cocaine and heroin." Further, CW described the way the drug distribution conspiracy worked and noted that Defendant utilized the residence to regularly store evidence connected to drug distribution.

<em>(c)      CW's information in the affidavits was corroborated.</em>

Additionally, Defendant asserts that the information provided by CW was not corroborated. This statement is belied by information provided in both the affidavits for

4223 West Sacramento and 4217 East Sacramento.  As a preliminary matter, probable cause may be found from statements made by reliable persons, *Gates*, 462 U.S. at 245; statements made by confidential informants corroborated by independent investigation, *Draper v. United States*, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, *McDonald v. United States*, 335 U.S. 451, 454 (1948).  These methods of establishing probable cause, however, are by no means all-inclusive.

"Where probable cause depends upon information supplied by an informant, '[t]he core question … is whether the information is reliable.'"  *United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013) (*quoting United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)).  In *United States v. Faulkner*, the Court noted that while the reliability, veracity, and basis of knowledge of a confidential informant are relevant considerations for the judge, "'they are not independent essential elements in determining probable cause.'"  826 F.3d 1139, 1144 (8th Cir. 2016) (*quoting United States v. Recivich*, 793 F.2d 957, 959 (8th Cir. 1986)).  Like Defendant, Faulkner argued that the confidential informant's information was stale.  The Court found Faulkner's claim of staleness to be meritless because the confidential informant's information about Faulkner's whereabouts and activities had been corroborated by officers at the time application for the residence and vehicle search warrants was made.  *Id*.

Moreover, "it is well established that even the corroboration of minor, innocent details can be sufficient to establish probable cause."  *Keys*, 721 F.3d at 518.  And, when a confidential informant offers particularized information to the police in person, the officers receiving that information have the ability to further assess the informant's credibility.  *See*

*United States v. Braden*, 844 F.3d 794, 799 (8th Cir. 2016) (*citing Solomon*, 432 F.3d at 827-28).

Here, CW's information was repeatedly corroborated in connection with these warrants and throughout the entirety of the on-going investigation into Defendant.  As discussed above, CW was able to provide specific details about weapons that he, Defendant, and other associates used to commit murders.  CW's information was corroborated by the physical ballistic evidence seized from those multiple murder scenes. CW also provided information about the vehicles used in murders which was corroborated by officers.  For example, CW reported that Defendant and "D" utilized an Audi vehicle to commit the murder of Anthony Clark.  Video surveillance of the homicide captured a light colored, four door Audi.  CW identified an Infiniti vehicle which was also used in several murders.  Officers were able to corroborate that these vehicles existed and identify where those vehicles were likely stored based upon CW's statements.  Consistent with *Braden* and *Keys*, officers had particularized information and were able to corroborate details provided by CW which were sufficient to establish probable cause.

> **5.  Officers executing the 4223 West Sacramento and 4217 East Sacramento search warrants acted in good faith.**

Any evidence obtained as a result of the search warrants is equally protected by the good faith exception to the exclusionary rule.  It has long been established that when officers, acting in good faith, rely upon a search warrant issued by a detached and neutral magistrate that turns out to be lacking in probable cause or contained some other technical defect, the evidence need not be excluded.  *Leon*, 468 U.S. 897; *Sheppard*, 468 U.S. 981.

"Under the good-faith exception, evidence seized pursuant to a search warrant later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *Jackson*, 784 F.3d at 1231. This "good-faith inquiry is confined to the objectively ascertainable question of whether a reasonably well-trained officer would have known that the search was illegal despite the" court's authorization of the warrant. *Clay*, 646 F.3d at 1127.

In determining the presence of good-faith reliance on a judge issued search warrant, the reviewing court must consider the totality of the circumstances, including information not presented to the judge issuing the search warrant but known to the police officers. *Jackson*, 784 F.3d at 1231. *See also United States v. Hager*, 710 F.3d 830, 837 (8th Cir. 2013); *United States v. Rodriguez*, 484 F.3d 1006, 1012 (8th Cir. 2007) (officer's knowledge of facts beyond those presented in the search warrant justified reliance on a defective warrant). As stated earlier, *Jackson* outlines four situations in which the good-faith exception would not apply. Defendant cannot establish that any of situations outlined in *Jackson* are present here.

Judge Noce was not misled by false information; there was no evidence that Judge Noce abandoned his judicial role; the affidavits contained sufficient indicia of probable cause that official belief in their existence was entirely reasonable; and the warrants were not facially deficient. Therefore, even if the affidavits were insufficient to establish probable cause, the evidence seized as a result of the search warrants should not be suppressed pursuant to the good faith exception to the exclusionary rule.

## II.        64 BRIGHTON PARK DRIVE

### A.        Relevant Facts

#### 1.        August 26, 2015, federal indictment

On August 26, 2015, a federal grand jury returned a three-count indictment against Defendant (Doc. # 2).  In it, Defendant was charged with conspiracy to possess with the intent to distribute cocaine in violation of Title 21, United States Code, Sections 846 and 841; discharge of a firearm in furtherance of drug trafficking resulting in the December 29, 2013, deaths of victims Robert Parker and Clara Walker in violation of Title 18, United States Code Sections 2 and 924(j); and discharge of a firearm in furtherance of drug trafficking resulting in the January 21, 2014, death of Michail Gridiron in violation of Title 18, United States Code Sections 2 and 924(j) (Id.).

As to the drug conspiracy, Defendant was subject to a maximum possible penalty of 20 years' imprisonment.  As to the murder charges, Defendant was subject to a maximum possible penalty of death.  A federal warrant for Defendant's arrest was issued (*see* 4:15 CR 404 HEA, 08/26/2015 docket entry: "Warrant Issued as to Indictment in case as to Anthony Defendant. (DLB)").

#### 2.        Defendant's August 27, 2015, arrest

On August 27, 2015, officers conducted surveillance of a residence associated with Defendant located at 64 Brighton Park in Saint Charles, Missouri for purposes of effectuating the valid federal arrest warrant.  Beginning at approximately 9:45 a.m., Defendant exited 64 Brighton Park through its front door and entered the garage.  True and accurate portions of relevant surveillance video of 64 Brighton Park are submitted herewith

29

as **Exhibit 4** and incorporated herein by this reference.  Among other things, Defendant entered the driver's side of a green Pontiac Grand Prix that was located within the garage. Defendant backed his Grand Prix from the garage and parked it on the 64 Brighton Park driveway (**Exh. 4-A**).   Defendant re-entered  64  Brighton  Park (**Id.**).     Between approximately 9:47 and 9:50 a.m., Defendant twice exited the residence, placed items inside the Grand Prix, and reentered the residence (**Id.**).

At approximately 9:55 a.m., officers secured the perimeter of the 64 Brighton Park residence based upon their knowledge that Defendant was inside of it (**Exh. 4-B**).  Officers utilized an audible speaker system to communicate with Defendant and inform Defendant that there was a federal warrant for his arrest (**Id.**).  Officers ordered Defendant to exit 64 Brighton Park and surrender.  Defendant refused to exit 64 Brighton Park over the next approximately 31 minutes.  As a result, officers initiated direct contact with Defendant's defense counsel, Scott Rosenblum.  Mr. Rosenblum advised officers that Defendant would not surrender until a family member arrived at 64 Brighton Park.  Additionally, Mr. Rosenblum advised officers that two children were present with Defendant inside 64 Brighton Park.

At approximately 10:26 a.m., Defendant exited 64 Brighton Park through the front door and surrendered to officers (**Exh. 4-C**).  Defendant was detained and arrested pursuant to the federal warrant (**Id.**).   Once Defendant was arrested, officers retreated to more protected areas (*see* **Id.**).  Defendant was asked if anyone else was located within 64 Brighton Park.  Defendant advised that his two small children, including a five-month-old, remained inside 64 Brighton Park.  At approximately 10:28 a.m., a small child exited 64

Brighton Park (**Id.**).  The child was brought to a safe area by an officer (**Id.**).  Defendant advised officers that the five-month-old was the only remaining occupant inside 64 Brighton Park.  Defendant also stated that, prior to surrendering, Defendant telephoned a female associate and requested that she travel to 64 Brighton Park to take custody of the two children.  Defendant was also asked if there were any items such as weapons or contraband present inside 64 Brighton Park that could harm officers.  Defendant identified three loaded handguns within the middle dresser drawer in his bedroom and more specifically described the firearm as two .45 caliber and one F&N 5.7 caliber handguns.

Despite Defendant's arrest and contact made with the small child, officers remained in a protective posture behind vehicles and focused on the residence (**Id.**).  For security and safety purposes, six officers entered 64 Brighton Park at approximately 10:28 a.m. in formation behind a ballistic shield (**Id.**).  The baby was located and promptly brought outside the residence less than a minute after entry (**Id.**).  With the second child secure, three additional officers entered the residence to assist with the protective sweep (**Id.**).  Between approximately 10:28 and 10:36 a.m. -- roughly eight minutes -- officers remained in a protective formation and were able to examine places where a person could be hiding within the four bedrooms, multiple bathrooms, and basement contained within 64 Brighton Park's 3,186 square feet (**Exh. 4-D**; *see also* www.zillow.com/homes/64-brighton-park-drive-st-charles,-mo_rb/81428547_zpid/).  The protective sweep was confined to places large enough to hide a person and did not involve a search for items of evidentiary value. Those officers still outside the residence remained positioned behind vehicles for continued protective cover (*see* **Exhs. 4-C**, **4-D**).

31

Shortly after approximately 10:36 a.m., the majority of the protective sweep team had exited the residence and officers stationed outside the residence moved from behind their protected positions (**Id.**).  However, a small sub-set of the protective sweep team remained inside the residence adjacent to the closed attic space for purposes of ensuring that no person exited the attic space while observation equipment was being obtained to permit officers to confirm that no person or persons were hiding in the attic.  At approximately 11:21 a.m., observation equipment was received and brought into 64 Brighton Park (**Exh. 4-F**).  A visual observation of the attic was made utilizing the equipment.  No person was located.  At approximately 11:28 a.m. -- roughly seven minutes after the equipment arrived -- all remaining members of the protective sweep team exited the residence, and 64 Brighton Park was empty (**Id.**).

As officers were awaiting the attic observation equipment, Defendant's female associate arrived sometime before 11:15 a.m. to take custody of the two children.  Upon her arrival, she requested officers' assistance in retrieving items from within the Grand Prix and residence.  Items were retrieved by officers at her request from inside the vehicle and residence between approximately 11:15 and 11:21 a.m. (**Exhs. 4-E**, **4-F**).

No other items were seized while officers were inside 64 Brighton Park conducting the protective sweep.  Following the security sweep, multiple officers remained outside 64 Brighton Park while application for a federal search warrant directed to the residence was obtained (*see* **Exhs. 4-G**, **4-H**).

32

### 3.      August 27, 2015 warrant to search 64 Brighton Park

Following Defendant's arrest, Federal Bureau of Investigation Special Agent Brandon Burke (SA Burke) applied for a federal warrant authorizing the search of 64 Brighton Park.   A true and accurate copy of the 64 Brighton Park search warrant documentation is submitted herewith as **Exhibit 5** and incorporated herein by this reference.   The affidavit explained the drug trafficking and firearm possession in furtherance of drug trafficking resulting in death charges against Defendant.  It described the 64 Brighton Park location (and provided photographs) and the events surrounding Defendant's arrest that had occurred earlier that morning.

More specifically, the affidavit noted Defendant's statement that three firearms were located inside 64 Brighton Park.  Although the affidavit noted that officers conducted a protective sweep of 64 Brighton Park, nothing observed during the sweep was relied upon in the affidavit.[5]   The affidavit also summarized information received from CW about Defendant's criminal activities, including, but not limited to, Defendant's use of firearms in furtherance of Defendant's drug trafficking.  To that end, the affidavit provided detailed information about the practices of drug traffickers, their use of firearms and the connection between firearms and other items to drug trafficking.  As a result, the affidavit stated that, among other things, the firearms identified by Defendant inside 64 Brighton Park were "evidence of violations of the possession, use, and/or discharge of a firearm in furtherance

---

[5]     Defendant's argument that the search warrant directed to and search of 64 Brighton Place represent fruit of the poisonous tree as a result of the protective sweep must fail because *nothing* observed during the protective sweep was relied upon in connection with the search warrant's issuance and *nothing* of evidentiary value was seized during the protective sweep.

of drug trafficking offenses" and that "controlled substances, drug proceeds…documents evidencing participation in drug trafficking…firearm(s), documentation of residency and ownership…" would likely be found within 64 Brighton Park (**Exh. 5** at Aff. pp. 3, 5). Lastly, the affidavit noted that 64 Brighton Park had been secured by officers pending application of the search warrant.

Based upon the information contained in the application, Magistrate Judge Nolle C. Collins issued a search warrant at approximately 2:47 p.m. on August 27, 2015.  Entry into 64 Brighton Park pursuant to the search warrant began at approximately 3:09 p.m. (*see* **Exhs.** **4-G**, **4-H**).  Evidence was seized, including, among other things, multiple mobile phones; digital cameras; two . 45 caliber firearms and loaded magazines; a 5.7 caliber firearm and loaded magazine; a Sig Sauer firearm; a .380 caliber loaded magazine; holster; laser sight; and DVR recording system.  The return was filed with the court on or about September 3, 2015.

### B.     Opposition

#### 1.     The protective security sweep of 64 Brighton Park was appropriate and not overbroad.

Under the Fourth Amendment, the search of a residence is generally unreasonable "without a warrant issued on probable cause." *Maryland v. Buie*, 494 U.S. 325, 331 (1990). An exception to the general warrant requirement of the Fourth Amendment is the protective sweep. *See United States v. Waters*, 883 F.3d 1022, 1026 (8th Cir. 2018).  "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual

inspection of those places in which a person might be hiding." *Id.* at 327.  A protective

sweep must be supported by "a reasonable belief based on specific and articulable facts

that the area to be swept harbors an individual posing a danger to those on the arrest scene."

*Id.* at 337.

The Eighth Circuit has recognized the importance of officers' safety when

conducting a home arrest.  *See Waters*, 883 F.3d at 1026 (*citing United States v. Alatorre*,

863 F.3d 810, 814 (8th Cir. 2017)).  "Protective sweeps in these circumstances are justified

because officers are vulnerable during an arrest at a home, even when the arrestee and other

occupants have been secured ...."  *Id.*; *see also United States v. Davis*, 471 F.3d 938, 944

(8th Cir. 2006) ("A protective sweep is justified by the threat of accomplices launching a

surprise attack during an arrest and is particularly important during an in-home arrest, due

to the heightened potential for an ambush in unfamiliar surroundings.").  As explained by

*Buie*:

> [T]here is an ... interest of the officers in taking steps to assure
> themselves that the house in which a suspect ... has just been ...
> arrested is not harboring other persons who are dangerous and
> who could unexpectedly launch an attack. The risk of danger
> in the context of an arrest in the home is as great as, if not
> greater than, it is in an on-the-street or roadside investigatory
> encounter.... A protective sweep ... occurs as an adjunct to the
> serious step of taking a person into custody for the purpose of
> prosecuting him for a crime. Moreover, unlike an encounter on
> the street or along a highway, an in-home arrest puts the officer
> at the disadvantage of being on his adversary's "turf." An
> ambush in a confined setting of an unknown configuration is
> more  to  be  feared  than  it  is  in  open,  more  familiar
> surroundings. *Id.*

35

The inquiry as to the reasonableness and validity of a protective sweep is necessarily fact-specific." *Alatorre*, 863 F.3d at 814 (*citing United States v. Thompson*, 842 F.3d 1002, 1009 (7th Cir. 2016)).   Defendant contends that the officers' protective sweep of 64 Brighton Park was overbroad because Defendant "was arrested outside of his residence…" and "the officers were unaware of any facts that would give rise to a reasonable suspicion that dangerous individuals were in the house 'ready to launch an attack'" (Doc. # 3212 ¶¶ 45, 47-48).   Here, the protective sweep of the residence was justified.

> (a)    *A protective sweep of a residence after an outside arrest is lawful.*

First, protective sweeps of a residence after an arrest occurs outside of the residence are proper.  *Alatorre*, 863 F.3d at 813 (*citing United States v. Cavely*, 318 F.3d 987, 995-96 (10th Cir. 2003) (finding that officers executing an arrest warrant outside the back door of the defendant's house were justified in making a protective sweep of his house); *United States v. Hoyos*, 892 F.2d 1387, 1396-97 (9th Cir. 1989) (finding that narcotics officers were justified in making a protective sweep of defendant's residence after arresting him outside) (overruled on other grounds by *United States v. Ruiz*, 257 F.3d 1030, 1032 (9th Cir. 2001) (en banc)).  Use of the term "in-home" arrest is not limited to only those arrests which occur inside a residence, but instead includes those arrests occurring at or near an entry to the residence.  *See United States v. Pile*, 820 F.3d 314, 317 (8th Cir. 2016) ("Pile misreads *Buie*'s 'in-home arrest' language.  *See* [*Buie*, 494 U.S. at 337]. To be sure, the arrest in *Buie* occurred inside of a home. But the rationale supporting the Court's recognition of the protective sweep—safety of police officers and others—may extend

beyond a home's four walls, depending on the facts."); *see also Cavely*, 318 F.3d at 995-96; *United States v. Banks*, 884 F.3d 998, 1015 (8th Cir. 2018).[6]

The Eighth Circuit has also found a protective sweep valid even though the defendant "had already been handcuffed and taken to [another area]" before the sweep occurred. *Waters*, 883 F.3d at 1026 (*citing Alatorre*, 863 F.3d at 814 and *United States v. Boyd*, 180 F.3d 967, 975 (8th Cir. 1999)); *United States v. Ford*, 888 F.3d 922, 928 (8th Cir. 2018) ("Justification for a preventive sweep does not automatically end when a suspect is arrested."). The Eighth Circuit has likewise found a protective sweep to be reasonable in a building that did not immediately adjoin the place of arrest. *Alatorre*, 863 F.3d at 814 (*citing Davis*, 471 F.3d at 944-45 (upholding protective sweep of defendant's barn after arrest outside of the barn)); *see also United States v. Thompson*, No. 16-00264-01-CR-W-DGK, 2018 WL 3404070, at *8–9 (W.D. Mo. June 11, 2018), report and recommendation adopted, No. 4:16-CR-00264-01-DGK, 2018 WL 3398164 (W.D. Mo. July 12, 2018). Accordingly, the fact that Defendant was arrested outside after he finally surrendered does not invalidate the protective sweep or make it overbroad.

---

[6] In fact, the "in-home" description is not used when other structures or places are the subject of a protective sweep. *See Davis*, 471 F.3d 938 (barn); *United States v. Aguilar*, 743 F.3d 1144 (8th Cir. 2014) (front lawn); *United States v. Arzola*, No. 16-00290-01, 2017 WL 4837198, at *4 (W.D. Mo. Sept. 1, 2017), report and recommendation adopted, No. 4:16-CR-00290-01, 2017 WL 4819109 (W.D. Mo. Oct. 25, 2017) (inside garage); *Hoyos*, 892 F.2d at 1394 (back yard), overruled on other grounds by *Ruiz*, 257 F.3d 1030; *United States v. Jones*, 193 F.3d 948, 949 (8th Cir. 1999) (common area of apartment building permitted search of apartment shared by defendant).

> (b)     *The officers possessed a reasonable belief that someone else could be inside 64 Brighton Park posing a danger.*

Second, the protective sweep of 64 Brighton Park was justified by several articulable facts and rational inferences supporting the officers' reasonable beliefs that someone else could be inside posing a danger to them during or following the arrest.  *Buie*, 494 U.S. at 327; *Alatorre*, 863 F.3d at 814-815.  These facts and inferences include:

> (1)     Defendant delayed communication with officers, refused to surrender, and remained out of sight from officers for 31 minutes which created a reasonable uncertainty as to how many people were inside the residence and their intentions toward the officers, *Alatorre*, 863 F.3d at 814-815 (*citing Boyd*, 180 F.3d at 975-76 (upholding a protective sweep because "[w]hen the law enforcement officers entered the house ... they had no   way of knowing how many people were there") (internal quotation marks omitted); *Davis*, 471 F.3d at 944 ("A protective sweep may be executed after an arrest if there is a reasonable possibility that other persons may be present on the premises who pose a danger to the officers.")).

> (2)     While refusing to surrender, there was no indication as to what Defendant, or anyone else inside, was or was not doing.

> (3)     Defendant initiated communications with others while still inside the residence, including a female associate and an attorney.

(4)    Defendant left a young child and five-month-old baby inside 64 Brighton Park suggesting that, in doing so, another person or persons remained inside to care for the children's well-being.

(5)    Defendant had been charged with drug conspiracy and officers knew that, among other things, Defendant was involved in the long-term distribution of multiple kilogram quantities of cocaine.[7]

(6)    Defendant had been charged with the murder of three victims in furtherance of that drug trafficking conspiracy through use of a firearm. *See Alatorre*, 863 F.3d at 815 (noting that defendant's criminal history involving concealed weapons made it conceivable that others were in the house with access to weapons).

(7)    Officers knew that, among other things, Defendant was always armed with a firearm.

(8)    At the time of his arrest, Defendant confirmed the presence of three firearms inside 64 Brighton Park.

(9)    As a result of this information provided by Defendant and the exiting federal charges, officers knew that, at minimum, firearms were

---

[7]    The Eighth Circuit has recognized the association between drug offenses and violence in upholding protective sweeps of residences of known drug traffickers. *See Waters*, 883 F.3d at 1027 (*citing United States v. Cash*, 378 F.3d 745, 748–49 (8th Cir. 2004)).  That officers do not have exact details on the extent of an individual's distribution of illegal drugs does not render their decision to conduct a protective sweep erroneous; instead, it is reasonable for officers to believe that any other person inside the residence is dangerous. *Id.*

present inside 64 Brighton Park, giving anyone remaining inside the residence access to weapons to use in an ambush of the officers and making officers vulnerable to attack from someone inside the residence.

The officers encountered Defendant and his young child outside of the residence. At least one additional individual -- the five-month-old baby -- remained inside 64 Brighton Park. This is not to suggest that the five-month-old posed a threat. Instead, it further justifies the officers conducting the protective sweep of 64 Brighton Park as it was not apparent how many other individuals remained inside when the protective sweep was initiated. And, more specifically, the safety of the five-month-old child was in question. *Alatorre*, 863 F.3d at 814-815 (*citing United States v. Williams*, 577 F.3d 878, 881 (8th Cir. 2009) (noting similarly that "[w]hile hindsight reveals that the officers had already encountered all of the occupants of the home before conducting the protective sweep, that information was not apparent to the officers when they initiated the sweep"); *United States v. Lucas*, 898 F.2d 606, 610 (8th Cir. 1990) ("[I]t does not make sense to prescribe a constitutional test that is entirely at odds with safe and sensible police procedures."). Officers are never required to assume that no one else is in a home. *See, e.g., Waters*, 883 F.3d at 1025 (upholding a protective sweep even though the defendant's fiancée told officers that the defendant was the only person inside the residence).

Furthermore, it took Defendant approximately 31 minutes to exit the residence. It was reasonable for the police to believe that anyone else inside the home would have had the time and ability to hide from the officers' view during that time period, which had been

limited to the front entryway and the garage.  *See Alatorre*, 863 F.3d at 814-15 (holding protective sweep justified where defendant's girlfriend "lingered in the kitchen out of sight of the officers until she was specifically called to the door, indicating that it was easy for someone to hide just out of view of the officers inside the residence in a position from which an attack could be launched"); *Waters*, 883 F.3d at 1026-27 (noting that the officers' announcing their presence several times before breaching the door "provided anyone in the residence ample time to hide before officers entered the residence").

Further complicating officer safety was the fact that Defendant had at least one camera surveilling his home, which could have given ample forewarning to others in the house of the officers' arrival sufficient to allow someone to hide within the house. *See Davis*, 471 F.3d at 945 (upholding protective sweep where "surveillance cameras were attached to the [defendant's] house, which could indicate the heightened possibility of a surprise attack").

### (c)     The protective sweep was limited in time and scope.

Third, the officers conducted the protective sweep of the non-attic areas in a constitutional manner because it lasted only seven minutes and was confined to places within living areas large enough to hide a person.  The attic was not physically swept but was done so visually once the appropriate equipment was obtained.  The visual sweep of the attic likewise took roughly seven minutes.  The Eighth Circuit has echoed *Buie* by specifying that a protective sweep will be upheld if it is "quick and limited" and "initially confined to places large enough to conceal a person."  *Boyd*, 180 F.3d at 976 (internal quotation marks omitted); *see also United States v. Henderson*, 748 F.3d 788, 793 (7th Cir.

2014) (protective sweep of house lasted "no longer than five minutes"); *United States v. Laudermilt*, 677 F.3d 605, 608–09 (4th Cir. 2012) (sweep of two-story house "from start to finish, lasted about five minutes"); *United States v. Hauk*, 412 F.3d 1179, 1184 (10th Cir. 2005) (sweep of residence "lasted approximately five to ten minutes"); *United States v. Flowers*, 424 Fed. App'x 302, 303 (5th Cir. 2011) (protective sweep of two-story house and garage "lasted no longer than five minutes").   Courts have recognized that a short sweep is an indication that the search was truly cursory in nature.  *See, e.g., United States v. Burrows*, 48 F.3d 1011, 1017 (7th Cir. 1995) ("The record supports the determination that the search of the four bedrooms and linen closet, which required the officers to force four locked doors, took no more than five minutes, an interval compatible with the officers' legitimate purpose."); *United States v. Hogan*, 38 F.3d 1148, 1150 (10th Cir. 1994) ("[I]t appears from the officer's testimony that the protective sweep could have truly been cursory and ended ... a few minutes after the arrest."); *see also United States v. Lesane*, 685 Fed. App'x 705, 722 (11th Cir. 2017) (noting that protective sweep of single-story house "took no longer than three or four minutes, lending support to the conclusion that the sweep was cursory in nature").

(d)     *Seizure of 64 Brighton Park pending search warrant application was legally permissible.*

Lastly, after the limited physical and visual protective sweeps were concluded, officers lawfully seized 64 Brighton Park while application was made for a federal search warrant to prevent Defendant or anyone else from destroying evidence or to bring risk to the officers.  *See Illinois v. McArthur*, 531 U.S. 326, 331-32 (2001) (ruling that warrantless seizure of defendant by preventing him from entering his trailer residence unaccompanied was a reasonable action to prevent him from destroying evidence).  A temporary seizure supported by probable cause and designed to prevent the loss of evidence while the police diligently obtain a warrant in a reasonable period of time is never unlawful.  *See McArthur*, 531 U.S. at 334.  Here, officers had probable cause to believe evidence of a crime would be found in Defendant's 64 Brighton Park residence.  It was known that Defendant was a drug trafficker, that Defendant regularly possessed firearms in furtherance of that drug trafficking, and that Defendant had at least three firearms within 64 Brighton Park. [8] Officers properly secured 64 Brighton Park to preserve the evidence and did so only for the time necessary to actually obtain the federal search warrant.

Accordingly, Defendant's lawful arrest and the proper protective sweep of 64 Brighton Park provide no basis for suppression.

---

[8]     Defendant was subsequently charged in Count 13 of the Fifth Superseding Indictment for his illegal possession of firearms in furtherance of Defendant's drug trafficking that were seized on August 27, 2015, from inside 64 Brighton Park (Doc. # 1989 at p. 25).

2.      **The affidavit in support of the 64 Brighton Park search warrant established probable cause and did not rely upon any information gleaned during the protective security sweep.**

The Fourth Amendment prohibits unreasonable searches and seizures and requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized."  *See United States v. Eggerson*, No. 19-3742, 2021 WL 2303072, at *2 (8th Cir. June 7, 2021).  If evidence was gathered in violation of the Fourth Amendment, it may be suppressed under the exclusionary rule.  *Leon*, 468 U.S. at 906.  But even when a search warrant is defective or invalid, the good faith exception may apply.  *Id.* at 925, 104 S.Ct. 3405.

As discussed in connection with the 4223 West Sacramento and 4217 East Sacramento search warrants, the standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant.   When determining whether probable cause exists, a court does not independently evaluate each piece of information, but, rather, considers all of the facts for their cumulative meaning. *United States v. Allen,* 297 F.3d 790, 794 (8th Cir. 2002).  As the Supreme Court stated in *Gates*, 462 U.S. at 214:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. *Jones v. United States,* 362 U.S., at 271, 80 S.Ct., at 736; *see also United States v. Baker*, No. 1:11-CR-103-JAR, 2012 WL 12527307, at *11 (E.D. Mo. Sept. 29,

2012), *report and recommendation adopted sub nom.*; *United States v. Turner*, No. 1:11-CR-103-JAR, 2013 WL 11271638 (E.D. Mo. Mar. 15, 2013), *aff'd,* 781 F.3d 374 (8th Cir. 2015).

The *Gates* Court offered the following caution to reviewing courts, *Id.* at 236:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Spinelli, supra,* 393 U.S., at 419, 89 S.Ct., at 590.
>
> A grudging or negative attitude by reviewing courts toward warrants," *Ventresca,* 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense, manner. *Id.,* at 109, 85 S.Ct., at 746.

For a warrant to issue properly under the Fourth Amendment, the warrant must be supported by probable cause. *Gates*, 462 U.S. at 238-39; *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006). Probable cause exists, if under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238-39. In deciding whether there is probable cause to support a warrant, a judge may draw reasonable inferences from the totality of the circumstances. *Summage*, 481 F.3d at 1078.

Probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules. The Supreme Court found, *Gates* 462 U.S. at 231, quoting from *Brinegar v. United States* (citation omitted), that the probable cause standard is a "practical, nontechnical

conception" and "[i]n dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

In analyzing the search warrant directed to 64 Brighton Park, it is clear that probable cause existed (*see* **Exh. 5**).  The affidavit explained the drug trafficking and firearm possession in furtherance of drug trafficking resulting in death charges against Defendant. It described the events surrounding Defendant's arrest that had occurred earlier that morning and noted Defendant's statement that three firearms were located inside 64 Brighton Park.  The affidavit also summarized information received from CW about Defendant's criminal activities, including, but not limited to, Defendant's use of firearms in furtherance of Defendant's drug trafficking.  To that end, the affidavit provided detailed information about the practices of drug traffickers, their use of firearms and the connection between firearms and other items to drug trafficking.  As a result, the affidavit established a fair probability that evidence of Defendant's crimes would likely be found within 64 Brighton Park.

As set forth above, this Court's role is simply to determine whether the issuing court had a substantial basis for making the "practical, common-sense decision" it did about whether there was a "fair probability" that officers would discover evidence connected with a crime within 64 Brighton Park.  *See Gates,* 462 U.S. at 238; *Oropesa,* 316 F.3d at 766. Although each piece of information stated in the affidavit may not provide sufficient probable cause for the warrant to issue, taken together and given the totality of the

circumstances, a reasonable person could believe there was a fair probability that evidence of a crime would be found in the phone information sought pursuant to this search warrant.

### 3.  Officers executing the 64 Brighton Park search warrant acted in good faith.

Should this Court find probable cause lacking, the *Leon* exception should apply because there was a facially valid warrant that was reasonably relied upon.  Evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry,* 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell,* 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted).

Here, the good-faith exception applies.  There is no evidence to suggest that: (a) the judge abandoned her detached and neutral role; (b) the special agent was dishonest or reckless in preparing the affidavit; (c) the officers' reliance on the warrant was not in good faith; or (d) the officers' reliance was not reasonable. *See United States v. Temple*, No. 4:15-CR-230-JAR-JMB, 2017 WL 7798109, at *37 (E.D. Mo. Oct. 6, 2017), report and recommendation adopted, No. 4:15-CR-230-JAR, 2018 WL 1116007 (E.D. Mo. Feb. 27,

2018) (citations omitted); *United States v. Baker*, 2012 WL 12527307, at \*12–13; *United States v. Turner*, No. 1:11-CR-103-JAR, 2013 WL 11271638 (E.D. Mo. Mar. 15, 2013), *aff'd*, 781 F.3d 374 (8th Cir. 2015); *United States v. Lindsey*, No. CRIM. 10-15 JNE JJK, 2010 WL 4822939, at \*33 (D. Minn. July 20, 2010), *report and recommendation adopted in part*, No. CRIM. 10-15 JNE JJK, 2010 WL 4822925 (D. Minn. Nov. 22, 2010), *aff'd in part,* 702 F.3d 1092 (8th Cir. 2013).  Just the opposite is true: the attesting agent affirmatively stated in his affidavit that he believed probable cause existed and the judge agreed by signing and issuing the warrant.

\*      \*      \*

In sum, the seizure of evidence from 64 Brighton Park occurred pursuant to a valid search warrant supported by probable cause and conducted consistent with the good faith exception to the warrant requirement.  The evidence seized from 64 Brighton Park was lawfully seized and is admissible.

III.    **PONTIAC GRAND PRIX**

A.    **Relevant Facts**

1.    **August 26, 2015, federal indictment and Defendant's August 27, 2015 arrest**

On August 26, 2015, a federal grand jury returned a three-count indictment against Defendant for one count of conspiracy to possess with the intent to distribute cocaine in and two counts of discharge of a firearm in furtherance of drug trafficking resulting in the December 29, 2013, and January 21, 2014, deaths of three victims  (Doc. # 2).

On August 27, 2015, officers conducted surveillance of 64 Brighton Park in Saint Charles, Missouri for purposes of effectuating Defendant's valid federal arrest warrant. Beginning at approximately 9:45 a.m., Defendant exited 64 Brighton Park through its front door and entered the garage (**Exh. 4-A**).  Among other things, Defendant entered the driver's side of a green Pontiac Grand Prix that was located within the garage.  Defendant backed his Grand Prix from the garage and parked it on the 64 Brighton Park driveway (**Id.**).  Defendant re-entered 64 Brighton Park (**Id.**).  Between approximately 9:47 and 9:50 a.m., Defendant twice exited the residence, placed items inside the Grand Prix, and reentered the residence (**Id.**).

As previously discussed, Defendant was eventually arrested pursuant to the valid federal arrest warrant.  The existence of the federal arrest warrant gave officers legal authority to be on the 64 Brighton Park premises; so did the federal search warrant directed to 64 Brighton Park that was obtained post-arrest (also discussed above).

## 2.      August 27, 2015, seizure of the Grand Prix

Officers conducted a security sweep of 64 Brighton Park in connection with Defendant's arrest and later obtained a federal search warrant directed to 64 Brighton Park. While lawfully on the premises of 64 Brighton Park for purposes of arresting Defendant, conducting the protective sweep, obtaining children's items at the request of Defendant's female associate, and while executing the federal search warrant, officers observed a Pontiac Grand Prix that Defendant had previously parked in the driveway. The Grand Prix was of significance because the on-going investigation had determined that Defendant used multiple different vehicles to commit violent acts, including murder, and to transport controlled substances. As a result, the Grand Prix was evidence of Defendant's crimes.[9]

Officers also knew that Defendant undertook efforts to prevent the identification of vehicles used by Defendant to commit acts of violence, which included repainting the vehicle. Upon further inspection of the Grand Prix prior to seizure, one or more officers observed that the Grand Prix had been repainted. One or more officers were also able to observe some of the Grand Prix's contents from outside the vehicle. In plain view inside the Grand Prix was an unzipped bag along with other semi-automatic firearm- and firearm-shooting range-related items. These items observed within the Grand Prix were of significance as officers had been previously informed that, in preparation for the commission of violent acts, Defendant utilized firearm shooting ranges to perfect his aim.

---

[9]      Officers observed a red vehicle parked within the 64 Brighton Park garage which was registered to a female. The red vehicle was not seized as no connection between Defendant, Defendant's criminal activity, and the red vehicle existed.

The Grand Prix was photographed prior to seizure of the vehicle -- but no search or seizure of any item occurred.  True and accurate copies of photographs relevant to the Grand Prix and this suppression issue are submitted herewith as **Exhibit 6** and incorporated herein by this reference.

The Grand Prix was transported to the Saint Louis, Missouri, Federal Bureau of Investigation office where it was secured.  Once there, officers again observed from outside of the vehicle, in plain view, the unzipped bag, its contents, and other firearm-related items. However, no search of the Grand Prix was conducted at that time either.[10]

---

[10]     "It is settled that an officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object." *Gillispie v. Griffith*, No. 4:14CV257 NAB, 2017 WL 1164813, at *6 (E.D. Mo. Mar. 29, 2017) (citations omitted); *United States v. Humphrey*, No. 4:12CR128 CEJ NAB, 2012 WL 4793766, at *5 (E.D. Mo. Sept. 11, 2012), report and recommendation adopted, No. 4:12-CR-128 CEJ, 2012 WL 4793713 (E.D. Mo. Oct. 9, 2012), aff'd, 753 F.3d 813 (8th Cir. 2014) (*quoting United States v. Darr*, 661 F.3d 375, 379 (8th Cir. 2011) (*quoting United States v. Bustos–Torres*, 396 F.3d 935, 944 (8th Cir. 2005))).  "Neither exigency nor inadvertence is an element of the plain view doctrine." *Id.* (*quoting PPS, Inc. v. Faulkner Cnty.*, 630 F.3d 1098, 1106 (8th Cir. 2011) (*citing Horton v. California*, 496 U.S. 128, 137–38 (1990)); *see also See United States v. Evans*, 830 F.3d 761, 767 (8th Cir. 2016) (*quoting United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) ("[A] person who parks a car—which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car.").  While these requirements were satisfied here, no seizure was made at the time the items were viewed. Instead, officers properly obtained a federal search warrant.  Therefore, Defendant's challenge to the search of the Grand Prix's under the plain view doctrine is misplaced (*see* Doc. # 3212 at pp. 20-21).

### 3.      September 16, 2015, warrant to search the Grand Prix

Following Defendant's arrest and seizure of the Grand Prix, SA Burke applied for a federal warrant authorizing officers to search the Grand Prix.  A true and accurate copy of the Grand Prix search warrant documentation is submitted herewith as **Exhibit 7** and incorporated herein by this reference.

As it related to the Grand Prix, the affidavit explained the drug trafficking and firearm possession in furtherance of drug trafficking resulting in death charges against Defendant.  It described the Grand Prix vehicle, including its vehicle identification number, license plate and registration information.  The affidavit detailed the events surrounding Defendant's arrest, Defendant's operation of the Grand Prix, the search of 64 Brighton Park, and the seizure of the Grand Prix, all of which occurred on August 27, 2015.  The affidavit noted the seizure of five magazine-fed firearms from 64 Brighton Park, four of which were loaded.

The affidavit also noted that:

> [i]nvestigators have interviewed numerous witnesses, confidential informants, and parties related to the investigation, that have identified JORDAN's criminal organization's modus operandi.  These interviews, in conjunction with other aspects of the case, have revealed JORDAN's past utility of the [Grand Prix] to further his criminal organization…[and] were used in illegal drug trafficking and violent criminal offenses (**Exh. 7** at Aff. p. 3).

In addition, the affidavit summarized detailed information provided by CW on five separate occasions, including in the days following the Grand Prix's lawful seizure pending

application of the search warrant.  As it related specifically to the Grand Prix, the affidavit set forth CW's information as to Defendant's utilization of the Grand Prix:

> …JORDAN used the Pontiac Grand Prix to transport and distribute cocaine.  Further, JORDAN used the Grand Prix to transport firearms, which the investigation has demonstrated were used to protect the criminal enterprise.  According to the CW, the Grand Prix was previously red until JORDAN had it painted to the current light green color.  JORDAN would often paint his vehicles to evade law enforcement as well as avoid being detected by competitors…Additionally, JORDAN only owned fast vehicles that could outrun the police.  According to the CW, JORDAN enhanced the Grand Prix with a pro charger system, which is an after-market modification to a vehicle's engine that will increase speed and performance.  Lastly, JORDAN paid extra to have a 'prevent child abuse-themed' license plate out on the Grand Prix in yet another measure to deter law enforcement (**Id.** at Aff. p. 4).

The affidavit noted the unzipped black bag containing semi-automatic firearm magazines observed by officers within the Grand Prix's back seat.

Accordingly, officers believed that evidence of drug distribution and violent criminal offenses would be located inside the Grand Prix.  To that end, the affidavit provided detailed information about the practices of drug traffickers, their use of firearms and the connection between firearms and other items to drug trafficking.  As a result, the affidavit stated that, among other things, "controlled substances, drug proceeds…documents evidencing participation in drug trafficking…firearm(s), ammunition, magazines, evidence of possession of a firearm in furtherance of drug trafficking crimes, documentation of possession and/or ownership of the [Grand Prix], and/or cellular phones or other electronic devices" would likely be found within the Grand Prix.

Based upon the information contained in the application, Magistrate Judge Thomas

C. Mummert issued a search warrant at approximately 1:30 p.m. on September 16, 2015.

The warrant was formally executed at approximately 2:30 p.m. that same day.  Evidence

was seized, including a mobile phone; iPod; ski mask; three black shirts; gloves; head

coverings; firearm magazine loaded with 20 rounds of ammunition; and a firearm magazine

loaded with 15 rounds of ammunition.  The return was filed with the court on or about

October 29, 2015.

### B.     Opposition

The seizure and subsequent search of the Grand Prix were proper because both were

supported by probable cause.  As the Eighth Circuit has observed:

> Although our Fourth Amendment cases sometimes refer
> indiscriminately to searches and seizures, there are important
> differences between the two.... The Amendment protects two
> different interests of the citizen—the interest in retaining
> possession of property and the interest in maintaining personal
> privacy. A seizure threatens the former, a search the latter. As
> a matter of timing, a seizure is usually preceded by a search,
> but when a container is involved the converse is often true.
> Significantly, the two protected interests are not always present
> to the same extent; for example, the seizure of a locked suitcase
> does not necessarily compromise the secrecy of its contents,
> and the search of a stopped vehicle does not necessarily deprive
> its owner of possession. *United States v. Clutter,* 674 F.3d 980,
> 984 (8th Cir.2012) (*quoting Texas v. Brown,* 460 U.S. 730,
> 747–48 (1983) (Stevens, J ., concurring)).

### 1.     The Grand Prix's seizure was supported by probable cause.

It is well established that "[l]aw enforcement authorities must [only] possess a

reasonable suspicion based on articulable facts that a package contains contraband before

they may detain the package for investigation." *United States v. Johnson*, 171 F.3d 601,

603 (8th Cir. 1999); *see also United States v. Terriques*, 319 F.3d 1051, 1056 (8th Cir. 2003) ("A seizure will not violate the Fourth Amendment if the authorities have reasonable suspicion based on articulable facts that a package contains contraband...." (quotation marks and citation omitted)). Here, although unnecessary, there was much more than just a reasonable, articulable suspicion that the Grand Prix was evidence and/or contained contraband based upon the information available to officers.

"Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the [Supreme] Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Stephen*, 984 F.3d 625, 631 (8th Cir. 2021), reh'g denied (Feb. 5, 2021) (*quoting United States v. Place*, 462 U.S. 696, 701 (1983)); *see also United States v. Smith*, 715 F.3d 1110, 1116-17 (8th Cir. 2013). "[U]nder these circumstances, the risk of the item's disappearance or use for its intended purpose before a warrant may be obtained outweighs the interest in possession." *Id.* at 701–02; *see also Clutter*, 674 F.3d at 985 (citation omitted) (seizure of defendant's computers was necessary "to ensure that the hard drive was not tampered with before a warrant was obtained").

First, the officers had probable cause to believe the Grand Prix was evidence of a crime and contained contraband. "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Stephen*, 984 F.3d at 631

(*quoting United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)).  Here, officers understood that Defendant used vehicles for the purposes of committing illegal activity, including the commission of murders and drug trafficking.   Officers also knew that Defendant repainted vehicles used during the commission of violent crimes to avoid identification or detection of the vehicles.   Here, the Grand Prix had been repainted. Further, firearm-related items were observed in plain view inside of it.

Second, "the exigencies of the circumstances demand[ed]" seizing the Grand Prix pending issuance of a warrant "to prevent the disappearance of evidence" and "to ensure that the [evidence] was not tampered with before a warrant was obtained." *See Place*, 462 U.S. at 701.  An officer's intention to avoid the destruction or tampering of evidence is a valid reason to temporarily seize evidence while a warrant is obtained.  *Clutter*, 674 F.3d at 985.  Here, the Grand Prix itself, as well as any contraband contained inside, was parked in a driveway to which any passerby, or associate of Defendant, could gain access.  Without immediate seizure, the police risked losing the evidence. *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013) (upholding warrantless seizure of laptop pending obtaining a warrant).  Furthermore, Defendant now knew about the investigation and could take steps to destroy the evidence or have others do so on his behalf.  *See Id.* (*citing United States v. Beasley*, 688 F.3d 523, 529–30 (8th Cir. 2012) (upholding the warrantless seizure of container where "the police had a legitimate interest in preventing destruction of the potential contraband"); *Florida v. White*, 526 U.S. 559, 564-65 (1999) (suggesting that warrantless seizure of a vehicle would not violate the Fourth Amendment where the police had probable cause to believe that respondent's car contained contraband or was itself

contraband); *cf. Cardwell v. Lewis*, 417 U.S. 583, 593 (1974) (when the police have probable cause to conduct a search of a vehicle, and they impound the vehicle prior to conducting the search, the search is not unconstitutional); *United States v. Zavesky*, 839 F.3d 688, 697 (8th Cir. 2016) (*citing Goodale*, 738 F.3d at 922  (noting where officers have probable cause to believe item contains contraband and there is a legitimate interest in preventing destruction of the potential contraband, the Fourth Amendment permits seizure of the property, pending issuance of a warrant to examine its contents)); *United States v. Kaplan*, 526 Fed. Apps. 208, 214 (3d Cir. 2013) (police permitted to seize minivan and hold it without a warrant "for whatever period is necessary to obtain warrant for the search") (*quoting Chambers v. Maroney*, 399 U.S. 42, 51 (1970)); *United States v. Wellsandt*, No. CR 15-50008-JLV, 2016 WL 1688008, at *4 (D.S.D. Apr. 27, 2016) (impoundment of Ford pick-up truck pending warrant proper where risk of truck's disappearance before a warrant may be obtained outweighed the interest in possession); *United States v. Richardson*, No. CR 15-0176, 2016 WL 223705, at *5 (D.N.J. Jan. 19, 2016) (officers had probable cause both to search the vehicle and to seize it but, in an abundance of caution, officers lawfully impounded the car to allow them to first seek a search warrant); *but compare United States v. Vento*, 533 F.2d 838, 866 (3d Cir. 1976) (contrary to Defendant's argument here, defendant challenged the "automobile exception" and complained that police should have seized the vehicle first and refrained from searching it until obtaining a warrant for that purpose).

As the Sixth Circuit said in upholding the warrantless seizure of a suitcase while officers obtained a search warrant, "[t]his was a plain old-fashioned seizure of a person's

effects, based on probable cause, in order to prevent the disappearance of evidence and so that a warrant could be obtained and a search conducted." *See Clutter*, 674 F.3d at 985 (*quoting United States v. Respress,* 9 F.3d 483, 486 (6th Cir. 1993)).  The same can be said here.  Accordingly, there was no Fourth Amendment violation.  *See United States v. Mays*, 993 F.3d 607, 616-618 (8th Cir. 2021) (15-day delay during which officers held defendant's laptop pending the issuance of warrant was reasonable and did not cause the continuing seizure to violate Defendant's Fourth Amendment rights).[11]

Finally, because the warrantless seizure of the Grand Prix was justified by exigent circumstances, Defendant's argument that evidence obtained from the Grand Prix is

---

[11]    In addition to the valid search warrant, two additional bases exist to justify the seizure and search of the Grand Prix.  First, the record establishes that the Grand Prix and items within it could be validly seized under the plain view exception to the warrant requirement.  "Under the plain-view exception, officers may seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." *Beasley*, 688 F.3d at 530 (*quoting United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010)).  Here, officers knew that Defendant utilized the Grand Prix, firearms, ammunition, among other things, in furtherance of his drug trafficking enterprise.  Therefore, the locating of the Grand Prix in the driveway and plain viewing of firearm magazines within the Grand Prix permitted lawful seizure of the Grand Prix and those items.

Second, the record also establishes that the Grand Prix and items within it could be validly seized under the automobile exception to the warrant requirement.  If there is probable cause to search a vehicle, and the vehicle is readily mobile, the Fourth Amendment permits the police to search the vehicle without more. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (*citing California v. Carney*, 471 U.S. 386, 393 (1985)).  No special exigency is required beyond a showing of the mobility of the vehicle. *See Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999) (per curiam).  Here, the Grand Prix was readily mobile.  Officers observed the Defendant drive the Grand Prix from the garage to the open driveway.  It was movable.  It was operational.  "All that is necessary to satisfy this element is that the automobile is operational." *See, e.g., United States v. Watts,* 329 F.3d 1282, 1286 (11th Cir. 2003).

poisonous fruit also fails.  Suppressing evidence as the fruit of an illegal search or seizure depends on the "nexus between the constitutional violation and the challenged evidence." *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011).  As discussed, officers did not commit any constitutional violations as they had a legitimate basis to effectuate the federal arrest warrant, conduct a protective sweep of 64 Brighton Park, and make entry into 64 Brighton Park pursuant to a federal search warrant.  Further, officers possessed probable cause and exigent circumstances that justified the seizure of the Grand Prix.  Even if Defendant could demonstrate the seizure was unlawful, he fails to meet his burden to show a "factual nexus" between a constitutional violation and the challenged evidence. *Id.* The undisputed evidence shows the search warrant was based upon the information officers gathered prior to the Grand Prix's seizure and subsequent search.  *See Wong Sun*, 371 U.S. at 487 (holding exclusionary rule inapplicable when evidence is acquired through source independent of illegality); *see United States v. Swope*, 542 F.3d 609, 613-14 (8th Cir. 2008) (warrant is an independent source when based on evidence not obtained by unlawful act).  To this end, any officer was allowed to look through the windows of the Grand Prix -- and even use a flashlight if necessary -- and take note of items on view in the Grand Prix's interior to gain facts in support of a warrant application.  *See Hatten*, 68 F.3d at 261.  As such, any evidence obtained from the search of the Grand Prix is not related to any constitutional violation and was a product of an independent source.  The evidence is thus not the fruit of any unlawful police conduct and should not be suppressed. *See*, *e.g.*, *United States v. Wainright*, No. 18-05010-01-CR-SW-RK, 2019 WL 7285565, at *5 (W.D. Mo.

May 8, 2019), report and recommendation adopted in part, No. 3:18-05010-CR-RK, 2019

WL 7282501 (W.D. Mo. Dec. 27, 2019).

> **2.     The Grand Prix's search warrant was supported by probable cause.**

As discussed above, on August 27, 2015 probable cause existed to believe that the

Grand Prix was and also contained evidence of a crime.   The Supreme Court has defined

probable cause to search as "a fair probability that contraband or evidence of a crime will

be found in a particular place." *Gates*, 462 U.S. at 238.  Probable cause is "a fluid concept

turning on the assessment of probabilities in particular factual contexts not readily, or even

usefully, to a neat set of legal rules," and its existence determined by an analysis of the

totality of circumstances surrounding the intrusion. *Id.* at 232, 238.

Following the Grand Prix's seizure, officers again met with CW who provided more

specific detail regarding the Grand Prix.   Among other things, the cooperating witness

identified the Grand Prix as a vehicle used by Defendant to commit crimes and avoiding

detection by law enforcement and rival drug traffickers.   This was particularly compelling

based upon the fact that this specific, reliable information was being provided by CW who

committed criminal activity with Defendant.  *See United States v. Nolen*, 536 F.3d 834,

839-40 (8th Cir. 2008) (explaining that tips from identifiable informants deserve greater

weight because they "can be held responsible if [their] allegations turn out to be

fabricated"); *United States v. Stevens*, 530 F.3d 714, 718-19 (8th Cir. 2008) (finding

probable cause in part because the tipster had offered "a first-person, eyewitness account

of ... contraband").   Further, and consistent with CW's information, an unzipped bag

containing firearm magazines was readily observed inside the Grand Prix.  Based upon the information known to officers, the Grand Prix was an instrumentality of one or more crimes and these firearm magazines were evidence of Defendant's possession of firearms in furtherance of his drug trafficking. Here, officers had specific information that the Grand Prix was used by Defendant to conduct his drug trafficking and other crimes of violence. Armed with this information, SA Burke applied for and received a federal search warrant for the Grand Prix.

At the time SA Burke applied for the Grand Prix search warrant, CW's information had "been deemed reliable based upon physical surveillance, interviews of other sources and/or witnesses, the execution of search warrants, resulting in the seizure of physical evidence from, among other locations, a known stash house for JORDAN [4223 West Sacramento] in August 2015, and the existing overall investigation" (**Exh. 7** at Aff. p. 3). Further, CW had "testified under oath before the federal grand jury regarding his knowledge regarding JORDAN and JORDAN's criminal activity" (**Id.**).  Against that backdrop, CW identified the Grand Prix as a vehicle Defendant used to transport and distribute cocaine as well as transport firearms used to protect the criminal enterprise.

By locating the Grand Prix at 64 Brighton Park and observing Defendant drive it, officers had straightforwardly confirmed and corroborated the witness's information.  *See United States v. Morales,* 283 F.3d 952, 953 (8th Cir. 2001); *Williams,* 10 F.3d at 593).  Corroboration of minor, innocent details supports the finding of probable cause. *United States v. Carpenter,* 341 F.3d 666, 669 (8th Cir. 2003).  And not every detail must be corroborated. *See United States v. Gladney,* 48 F.3d 309, 313 (8th Cir. 1995).  But,

much was corroborated, including the fact that the Grand Prix has been repainted from red to light green, the engine had been modified, and a "child abuse prevention" license plate affixed to it.  This was plainly set forth in the Grand Prix search warrant documents.

As previously set forth above, this Court's role is simply to determine whether the issuing court had a substantial basis for making the "practical, common-sense decision" it did about whether there was a "fair probability" that officers would discover evidence of a crime. *See Gates,* 462 U.S. at 238; *Oropesa,* 316 F.3d at 766. Although each piece of information stated in the affidavit may not provide sufficient probable cause for the warrant to issue, taken together and given the totality of the circumstances, a reasonable person could believe there was a fair probability that the Grand Prix was evidence of a crime and that additional evidence of a crime would be found in the information sought pursuant to the Vehicles Search Warrant.

### 3.   Officers executing the Grand Prix search warrant acted in good faith.

Should this Court find probable cause lacking, the *Leon* exception should apply because there was a facially valid warrant that was reasonably relied upon.  Evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable. *Perry,* 531 F.3d at 665.

Here, the good-faith exception applies.  There is no evidence to suggest that: (a) Judge Mummert abandoned his detached and neutral role; (b) SA Burke was dishonest or reckless in preparing the affidavit; (c) the officers' reliance on the warrant was not in good

faith; or (d) the officers' reliance was not reasonable.  Just the opposite is true: SA Burke affirmatively stated in his affidavit that he believed probable cause existed and Judge Mummert agreed by signing and issuing the warrant.

*   *   *

The seizure of the Grand Prix was supported by probable cause and required to prevent potential evidence destruction.  The subsequent search of the Grand Prix was conducted pursuant to a valid search warrant supported by probable cause or, alternatively, the search was conducted consistent with the good faith exception to the warrant requirement.  The items located during the search of the Grand Prix were lawfully seized and are admissible.

## V.     PONTIAC GTO COUPE AND CHEVROLET SILVERADO SS

### A.     Relevant Facts

#### 1.     August 28, 2015, seizure of the Pontiac GTO and Chevrolet Silverado

On August 28, 2015, the day after Defendant's arrest had been publicized by local media, one or more officers was contacted by a representative of PUR Performance and First Capitol 4WD (PUR Performance).  Among other things, the representative stated that vehicles belonging to Defendant were located at PUR Performance.

An officer responded to PUR Performance.  Upon arrival, two vehicles were identified as Defendant's, a 2004 red Pontiac GTO Coupe and a 2004 black Chevrolet Silverado SS.  Order sheets were obtained and reviewed, indicating that the Pontiac GTO was provided to PUR Performance by Defendant for repair on or about August 4, 2015, and the Chevrolet Silverado was provided to PUR performance by Defendant for repair on August 5, 2015.

Among other things, PUR Performance employees described Defendant as a "loyal" customer for approximately five years who owned numerous vehicles serviced by PUR Performance.  Defendant routinely left his vehicles parked at PUR Performance for months after work was performed.  On several occasions, Defendant provided a vehicle to PUR performance for repair when no repairs were necessary.  Additionally, PUR Performance employees often observed weapons and ammunition in Defendant's vehicle; this included as assault rifle and handguns.

As to the two vehicles left by Defendant in August 2015, PUR Performance employees observed a pistol magazine inside the Chevrolet Silverado's glove compartment and numerous live rounds of ammunition in the center console of the Pontiac GTO.  The Pontiac GTO had also been repainted from black to red.  Both vehicles and relevant paperwork were seized by officers from PUR Performance on August 28, 2015.  Both vehicles were transported to the Saint Louis, Missouri, Federal Bureau of Investigation office where each was secured.  No search of the Pontiac GTO or Chevrolet Silverado was conducted at that time.

> **2.      September 16, 2015, warrants to search the Pontiac GTO and Chevrolet Silverado.**

Following the August 28 seizure of the Pontiac GTO and Chevrolet Silverado, SA Burke applied for a federal warrant authorizing officers to search each vehicle.  A true and accurate copy of the Pontiac GTO search warrant documentation is submitted herewith as **Exhibit 8** and incorporated herein by this reference.  A true and accurate copy of the Chevrolet Silverado search warrant documentation is submitted herewith as **Exhibit 9** and incorporated herein by this reference.

Each search warrant affidavit explained the drug trafficking and firearm possession in furtherance of drug trafficking resulting in death charges against Defendant.  Each described the vehicle, including its vehicle identification number, license plate and registration information.  Each affidavit detailed the events surrounding Defendant's arrest, Defendant's operation of the vehicles, the search of 64 Brighton Park, and the

seizure of the vehicle.  The affidavit noted the seizure of five magazine-fed firearms from 64 Brighton Park, four of which were loaded.

The affidavit also noted that:

> [i]nvestigators have interviewed numerous witnesses, confidential informants, and parties related to the investigation, that have identified JORDAN's criminal organization's modus operandi.  These interviews, in conjunction with other aspects of the case, have revealed JORDAN's past utility of the subject vehicles to further his criminal organization…[and] were used in illegal drug trafficking and violent criminal offenses (**Exh. 8** at Aff. p. 3; **Exh. 9** at Aff. p. 3).

In addition, each affidavit summarized detailed information provided by CW on five separate occasions, including on September 3, 2015, days after Defendant's arrest and days before the search warrant application.  As it related specifically to the Pontiac GTO, the affidavit set forth CW's information as to Defendant's utilization of the Pontiac GTO:

> …JORDAN used his Pontiac GTO to transport and distribute drugs, commit shootings, and flee from law enforcement.  On February 3, 2010…JORDAN [and two other individuals] operated the Pontiac GTO, which was black at the time, to shoot and kill [Marquis] JONES and [Keairrah] JOHNSON.
>
> According to the CW, JORDAN owned the Pontiac GTO since circa 2006/2007.  JORDAN has transported and distributed drugs from the Pontiac GTO.  JORDAN painted the vehicle red in an effort to evade law enforcement.  Further, JORDAN had a "prevent child abuse-themed" license plate on the vehicle to deter detection, as well (**Exh. 8** at Aff. p. 5).

As it related specifically to the Chevrolet Silverado, the affidavit set forth the cooperating witness' information as to Defendant's utilization of the Chevrolet Silverado:

> …JORDAN used his Chevrolet Silverado SS to transport and distribute drugs and transport firearms, which were used by JORDAN to protect his drug enterprise.  According to the CW,

> JORDAN used the Chevrolet Silverado SS to pull a trailer, which contained drugs (**Exh. 9** at Aff. p. 6).

Accordingly, officers believed that evidence of drug distribution and violent criminal offenses would be located inside the Pontiac GTO and Chevrolet Silverado.  To that end, the affidavit provided detailed information about the practices of drug traffickers, their use of firearms and the connection between firearms and other items to drug trafficking.  As a result, the affidavit stated that, among other things, "controlled substances, drug proceeds…documents evidencing participation in drug trafficking…firearm(s), ammunition, magazines, evidence of possession of a firearm in furtherance of drug trafficking crimes, documentation of possession and/or ownership of the subject vehicles, and/or cellular phones or other electronic devices" would likely be found within the Grand Prix.

Based upon the information contained in the application, Magistrate Judge Thomas C. Mummert issued a search warrant at approximately 1:30 p.m. on September 16, 2015.  The warrant was formally executed at approximately 2:30 p.m. that same day.  Evidence was seized from the Pontiac GTO, including a facial mask; gloves; holster; ammunition; and documents connected to Defendant.  Evidence was also seized from the Chevrolet Silverado, including a loaded firearm magazine; a glove; gun case; and box of ammunition.  The return was filed with the court on or about October 29, 2015.

### B.      Opposition

### 1.      The seizures of the Pontiac GTO and Chevrolet Silverado were supported by probable cause.

The applicable law previously set forth within this response and factual record establish that the seizure and subsequent search of the Pontiac GTO and Chevrolet Silverado were proper because both were supported by probable cause.

Seizure was appropriate because, first, the officers had probable cause to believe the Pontiac GTO and Chevrolet Silverado were evidence of a crime and contained contraband. "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Stephen*, 984 F.3d at 631 (*quoting Fladten*, 230 F.3d at 1085). Here, officers understood that Defendant used vehicles for the purposes of committing illegal activity, including the commission of murders and drug trafficking.  Further, a firearm magazine and rounds of live ammunition were observed by PUR Performance employees inside the vehicles.

Second, "the exigencies of the circumstances demand[ed]" seizing the vehicles pending issuance of a warrant "to prevent the disappearance of evidence" and "to ensure that the [evidence] was not tampered with before a warrant was obtained." *See Place*, 462 U.S. at 701.  An officer's intention to avoid the destruction or tampering of evidence is a valid reason to temporarily seize evidence while a warrant is obtained.  *Clutter*, 674 F.3d at 985.  Here, the vehicles themselves, as well as any contraband contained inside, were parked on a business parking lot to which any passerby, or associate of Defendant, could

gain access.  Without immediate seizure, the police risked losing the evidence. *See Goodale*, 738 F.3d at 922 (upholding warrantless seizure of laptop pending obtaining a warrant).  Furthermore, Defendant now knew about the investigation and could take steps to destroy the evidence or have others do so on his behalf. *Id.* (*citing Beasley*, 688 F.3d at 529–30 (upholding the warrantless seizure of container where "the police had a legitimate interest in preventing destruction of the potential contraband"); *White*, 526 U.S. at 564-65 (suggesting that warrantless seizure of a vehicle would not violate the Fourth Amendment where the police had probable cause to believe that respondent's car contained contraband or was itself contraband); *cf. Cardwell*, 417 U.S. at 593 (when the police have probable cause to conduct a search of a vehicle, and they impound the vehicle prior to conducting the search, the search is not unconstitutional); *Zavesky*, 839 F.3d at 697  (*citing Goodale*, 738 F.3d at 922 (noting where officers have probable cause to believe item contains contraband and there is a legitimate interest in preventing destruction of the potential contraband, the Fourth Amendment permits seizure of the property, pending issuance of a warrant to examine its contents)); *Kaplan*, 526 Fed. Apps. at 214 (police permitted to seize minivan and hold it without a warrant "for whatever period is necessary to obtain warrant for the search") (*quoting Chambers v. Maroney*, 399 U.S. 42, 51 (1970)); *Wellsandt*, 2016 WL 1688008 at *4 (impoundment of Ford pick-up truck pending warrant proper where risk of truck's disappearance before a warrant may be obtained outweighed the interest in possession); *Richardson*, 2016 WL 223705 at *5 (officers had probable cause both to search the vehicle and to seize it but, in an abundance of caution, officers lawfully impounded the car to allow them to first seek a search warrant); *but compare Vento*, 533

F.2d at 866 (contrary to Defendant's argument here, defendant challenged the "automobile exception" and complained that police should have seized the vehicle first and refrained from searching it until obtaining a warrant for that purpose).

As the Sixth Circuit said in upholding the warrantless seizure of a suitcase while officers obtained a search warrant, "[t]his was a plain old-fashioned seizure of a person's effects, based on probable cause, in order to prevent the disappearance of evidence and so that a warrant could be obtained and a search conducted." *See Clutter*, 674 F.3d at 985 (*quoting Respress,* 9 F.3d at 486). The same can be said here. Accordingly, there was no Fourth Amendment violation. *See Mays*, 993 F.3d at 616-618 (15-day delay during which officers held defendant's laptop pending the issuance of warrant was reasonable and did not cause the continuing seizure to violate Defendant's Fourth Amendment rights).[12]

Finally, because the warrantless seizure of the vehicles was justified by exigent circumstances, Defendant's argument that evidence obtained from the vehicles is poisonous fruit also fails. Suppressing evidence as the fruit of an illegal search or seizure depends on the "nexus between the constitutional violation and the challenged evidence." *Riesselman*, 646 F.3d at 1079. As previously discussed, officers did not commit any

---

[12]     Like the Grand Prix previously discussed, the record also establishes that the items within the Pontiac GTO and Chevrolet Silverado could be validly seized under the automobile exception to the warrant requirement. If there is probable cause to search a vehicle, and the vehicle is readily mobile, the Fourth Amendment permits the police to search the vehicle without more. *Labron*, 518 U.S. at 940 (*citing Carney*, 471 U.S. at 393). No special exigency is required beyond a showing of the mobility of the vehicle. *See Dyson*, 527 U.S. at 466–67. Here, the Grand Prix was readily mobile. Officers observed the Defendant drive the Grand Prix from the garage to the open driveway. It was movable. It was operational. "All that is necessary to satisfy this element is that the automobile is operational." *See, e.g., Watts,* 329 F.3d at 1286.

constitutional violations as they were invited upon the PUR Performance premises by its employees.  Further, officers possessed probable cause and exigent circumstances justified the seizure of the vehicles.  Even if Defendant could demonstrate the seizure was unlawful, he fails to meet his burden to show a "factual nexus" between a constitutional violation and the challenged evidence. *Id.* The undisputed evidence shows the search warrant was based upon the information officers gathered prior to the vehicles' seizure and subsequent search. *See Wong Sun*, 371 U.S. at 487 (1963) (holding exclusionary rule inapplicable when evidence is acquired through source independent of illegality); *see Swope*, 542 F.3d at 613-14 (warrant is an independent source when based on evidence not obtained by unlawful act).  As such, any evidence obtained from the search of the vehicles is not related to any constitutional violation and was a product of an independent source.  Thus, the evidence is not the fruit of any unlawful police conduct and should not be suppressed.  *See*, *e.g.*, *Wainright*, 2019 WL 7285565 at *5.

### 2.     The Pontiac GTO's and Chevrolet Silverado's search warrants were supported by probable cause.

On August 28, 2015, probable cause existed to believe that both vehicles were evidence of a crime and also contained evidence of a crime.  As noted earlier, probable cause is "a fluid concept turning on the assessment of probabilities in particular factual contexts not readily, or even usefully, to a neat set of legal rules," and its existence determined by an analysis of the totality of circumstances surrounding the intrusion. *Id.* at 232, 238.

Following the seizures of the Pontiac GTO and Chevrolet Silverado, officers again met with CW who provided more specific detail regarding each vehicle.  Among other things, CW identified both vehicles as used by Defendant to commit crimes and avoiding detection by law enforcement and rival drug traffickers, among other things.  This was particularly compelling based upon the fact that this specific, reliable information was being provided by CW who committed criminal activity with Defendant.  *See Nolen*, 536 F.3d at 839-40 (explaining that tips from identifiable informants deserve greater weight because they "can be held responsible if [their] allegations turn out to be fabricated"); *Stevens*, 530 F.3d at 718-19 (8th Cir. 2008) (finding probable cause in part because the tipster had offered "a first-person, eyewitness account of ... contraband").

Based upon the information known to officers, each vehicle was the instrumentality of one or more crimes and contained evidence of Defendant's possession of firearms in furtherance of his drug trafficking.  Here, officers had specific information that each vehicle was used by Defendant to conduct his drug trafficking and other crimes of violence. Armed with this information, SA Burke applied for and received a federal search warrant for each vehicle.

At the time SA Burke applied for the Pontiac GTO and Chevrolet Silverado search warrants, CW's information had "been deemed reliable based upon physical surveillance, interviews of other sources and/or witnesses, the execution of search warrants, resulting in the seizure of physical evidence from, among other locations, a known stash house for JORDAN [4223 West Sacramento] in August 2015, and the existing overall investigation" (**Exh. 8** at Aff. p. 3; **Exh. 9** at Aff. p. 3).  Further, CW "testified under oath before the

72

federal grand jury regarding his knowledge regarding JORDAN and JORDAN's criminal activity" (**Id.**).

Against that backdrop, CW identified the Pontic GTO as a vehicle Defendant used to commit a murder and had repainted from back to red to avoid detection, among other things.  By locating the Pontiac GTO and PUR Performance and speaking with employees, officers were able straightforwardly confirm and corroborate the witness's information because the Pontiac GTO had, in fact, been repainted.  *See Morales,* 283 F.3d at 953; *Williams,* 10 F.3d at 593).  Corroboration of minor, innocent details supports the finding of probable cause.  *Carpenter,* 341 F.3d at 669.  And not every detail must be corroborated. *See Gladney,* 48 F.3d at 313.  As for the Chevrolet Silverado, the fact that PUR Performance employees had observed firearm-related items inside of it similarly confirmed and corroborated CW's information that the Silverado was used by Defendant in connection with his possession of firearms in furtherance of drug trafficking activity and the drug trafficking activity itself.

As discussed throughout, this Court's role is simply to determine whether the issuing court had a substantial basis for making the "practical, common-sense decision" it did about whether there was a "fair probability" that officers would discover evidence of a crime. *See Gates,* 462 U.S. at 238; *Oropesa,* 316 F.3d at 766. Although each piece of information stated in the affidavit may not provide sufficient probable cause for the warrant to issue, taken together and given the totality of the circumstances, a reasonable person could believe there was a fair probability that each vehicle was evidence of a crime and

that additional evidence of a crime would be found in the information sought pursuant to the Pontiac GTO and Chevrolet Silverado search warrants.

### 3.   Officers executing the Pontiac GTO and Chevrolet Silverado search warrants acted in good faith.

Should this Court find probable cause lacking, the *Leon* exception should apply because there was a facially valid warrant that was reasonably relied upon.  Evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable. *Perry,* 531 F.3d at 665.

Here, the good-faith exception applies.  There is no evidence to suggest that: (a) Judge Mummert abandoned his detached and neutral role; (b) SA Burke was dishonest or reckless in preparing the affidavit; (c) the officers' reliance on the warrant was not in good faith; or (d) the officers' reliance was not reasonable.  Just the opposite is true: SA Burke affirmatively stated in his affidavit that he believed probable cause existed and Judge Mummert agreed by signing and issuing the warrant.

\*     \*     \*

The seizure of the Pontiac GTO and Chevrolet Silverado was supported by probable cause and required to prevent potential evidence destruction.  The subsequent search of each vehicle was conducted pursuant to a valid search warrant supported by probable cause or, alternatively, the search was conducted consistent with the good faith exception to the warrant requirement.  The items located during the search of the Pontiac GTO and Chevrolet Silverado were lawfully seized and are admissible.

## VII.   FIFTEEN DIGITAL DEVICES

### A.    Relevant Facts

During the course of the on-going investigation into Defendant's criminal activity and subsequent federal indictment, officers seized 15 digital devices, including multiple cellular telephones.  On October 6, 2015, SA Burke presented a search warrant application to Magistrate Judge Noelle C. Collins for authorization to search the 15 digital devices.  A true and accurate copy of the digital device search warrant documentation is submitted herewith as **Exhibit 10** and incorporated herein by this reference. [13]

The warrant was executed by the Federal Bureau of Investigation (FBI) on devices numbered 1, 2, 4, 5, 6, 7, 10, 12, 14, and 15 between October 8 and October 13, 2015, and data was extracted thereafter.  The FBI attempted to access and search devices 9 and 15 to no avail between October 8 and 13, 2015, as each was passcode protected. [14]

Devices 2, 6, 7, and 9, as well as a copy of extraction data already retrieved by the FBI from device 14, were submitted by the FBI on October 29, 2015 to the Regional Computer Crime Education and Enforcement Group of Greater Saint Louis for additional extraction efforts.  Search of and information extraction from any device subject to this

---

[13]     The return incorrectly lists October 2016, instead of October 2015, as the date the warrant was executed (*see* **Exh. 10**).

[14]     As to devices 3, 8, 11, and 13, each was initially accessed by the FBI between October 8 and October 13, 2015.  By this footnote, the United States represents that it does not intend to utilize information contained on devices 3, 8, 11, and 13 during any trial of Defendant.   Therefore, Defendant's challenge to the search each of these devices is moot.

search warrant was ultimately concluded by approximately June 2016.  The return was filed with the court on or about February 23, 2017.

**B.    Opposition**

    **1.    Evidence Seized from the 15 digital devices is admissible because officers did not recklessly disregard Rule 41, and Defendant is not prejudiced.**

Federal Rule of Criminal Procedure 41(e)(2)(A)(i) provides that a search warrant must be executed "within a specified time no longer than 14 days."  Rule 41(f)(1)(D) requires that the warrant and a copy of the inventory of seized items be returned promptly to the issuing judge.  Noncompliance with Rule 41 does not automatically require evidence to be suppressed.  *Schoenheit,* 856 F.2d 74.  The Eighth Circuit has held that "timeliness of execution should not be determined by means of a mechanical test with regard to the number of days from issuance, nor whether any cause for the delay was per se reasonable or unreasonable."  *United States v. Simpkins*, 914 F.2d 1054, 1059 (8th Cir. 1990).  Instead, the timeliness should be measured in terms of "*whether probable cause still existed at the time the warrant was executed.*"  *Id.* (emphasis supplied).  Exclusionary rules apply to violations of Rule 41 only if a defendant is prejudiced or there is reckless disregard of proper procedure.  *See United States v. Bieri*, 21 F.3d 811, 816 (8th Cir. 1994), *United States v. Mutschelknaus*, 592 F.3d 826, 829 (8th Cir. 2010); *United States v. Freeman*, 897 F.2d 346, 349 (8th Cir. 1990).

Defendant argues the evidence seized from 15 digital devices should be suppressed because officers failed to execute the warrant within the eight days provided by the search warrant.  Unclear from Defendant's motion is whether Defendant is arguing the search

must have begun before the eight-day period or whether it must have been completed within the eight-day period.  To the extent Defendant argues that the officers were required to complete the electronic search of the 15 digital devices within eight days, Defendant is incorrect.  "No presumptive time limit is found in the rule for when the review of a medium or copying of its data must be complete."  *See* Fed. R. Crim. P. 41(e)(2)(B); *Beckmann*, 786 F.3d at 680 n.6.

As detailed above, search of the 15 digital devices by the FBI occurred between October 8 and October 13, 2015 -- days after the search warrant was issued and prior to October 14, 2015.  A "search" of a computer is any use of the computer or its hardware to reveal information stored on the computer, when done in a way that would invade a reasonable expectation that data stored in the computer is private.  *See, e.g., United States v. Mann*, 592 F.3d 779, 786 (7th Cir. 2010) (referring to the forensic process as "searches of digital media"); *United States v. Burgess*, 576 F.3d 1078, 1089 (10th Cir. 2009) (referring to "authority to search [a computer's] contents"); *United States v. Adjani*, 452 F.3d 1140, 1143 n.1 (9th Cir. 2006).  A warrant can be executed by taking any step -- even a minimal one -- to intrude on the owner's expectation of privacy in its contents such as turning the device on or scrolling through the device's menu.  *See United States v. Holzman*, 871 F.2d 1496, 1505 (9th Cir. 1989) (officers flipped through address book at time of arrest and determined that it contained "a bunch of names and numbers") (*citing United States v. Burnette*, 698 F.2d 1038, 1049 (9th Cir. 1983)) e

The fact that a complete search and data extraction for each device may have taken longer than eight days is of no moment.  An initial search of a device's data constitutes

"execution" of a warrant, and a full forensic analysis of the device need not begin within Rule 41's time-limit.  After this initial search, the owner's expectation of privacy in the cell phone is significantly reduced.  *Cf. U.S. v. Guevera*, 589 F. Supp. 760, 762 (*citing Burnette*, 698 F.2d at 1049 (officers opened purse at time of arrest and saw it contained "a large sum of money" but only later discovered stolen money orders and examined bill serial numbers); *see also Holzman*, 871 F.2d 1496, 1505 (9th Cir. 1989) (later, additional examination of a package's content does not require warrant when initial viewing occurred pursuant to a warrant).

But, even if complete examination were somehow required, no reckless disregard of Rule 41 occurred, and Defendant has not been prejudiced in any way that would support exclusion.  In *Beckmann*, 786 F.3d at 680, the Eighth Circuit held that if a violation of Rule 41 occurs, "the Court may exclude the evidence described in the search warrant only if the defendant is prejudiced or if reckless disregard of proper procedure is evident."   In evaluating prejudice to the defendant, the Eighth Circuit has held that if the search would have occurred had Rule 41 been strictly adhered to, there is no prejudice to the defendant. *United States v. Turner*, 781 F.3d 374, 387 (8th Cir. 2015) (*quoting Hyten*, 5 F.3d at 1157). Moreover, a finding of reckless disregard of proper procedure must be based on some suggestion of bad faith.  *See id.*  In *Beckmann,* although officers secured a search warrant for computer media on August 15, 2011, the analyst did not begin to analyze the computers until November 2011 and hard drives until January 2012.  *Beckmann*, 786 F.3d at 676. Although this execution was well outside the fourteen-day time period, the court declined to suppress the evidence.  Further, the Court did not even reach whether the United States

violated Rule 41 because "there was neither prejudice nor reckless disregard sufficient to justify suppression of the physical evidence seized from Beckmann." *Id.* at 680. Moreover, assuming there was an actual delay, "the government did not exhibit reckless disregard for proper procedure in light of the length of time typically required to conduct computer analyses…" *Id.* at 680-81.  Here, testimony presented at the evidentiary hearing will show there was no reckless disregard for procedure.

Additionally, Defendant fails to identify how he has been prejudiced by any delay. To demonstrate prejudice, Defendant must show that the Rule 41 violation subjected him to a search that either would not have occurred or would not have been so "abrasive" if officers had followed the Rule.  *United States v. Williamson*, 439 F.3d 1125, 1133 (9th Cir. 2006).

Finally, Defendant fails to recognize that probable cause still existed at the time the search warrant was executed.  *See United States v. Nyah*, 928 F.3d 694 (8th Cir. 2019) (finding that even if a warrant was executed late, probable cause continued to exist).  In *United States v. Brewer*, 588 F.3d 1165, 1173 (8th Cir. 2009), this Court addressed a forensic analysis of computer evidence seized pursuant to a Missouri state search warrant that became void after 10 days.  There, the computer analysis took place after the 10 days expired.  The *Brewer* court held that, because the computer media at issue were electronically stored files in the custody of law enforcement, several months' delay in searching the media did not alter the probable cause analysis and the forensic analyses did not violate the Fourth Amendment.  *Id.*

Similarly, the cases of *United States v. Grimmett*, No. 04-40005-01-RDR,  2004 WL 3171788 at *5 (D. Kan. Aug. 10, 2004), and *United States v. Luken*, 515 F. Supp. 2d 1020 (D. S.D. 2007), are instructive.   In *Grimmett*, the district court addressed the issue of a delay of a computer search.  The district court concluded that the evidence should not be suppressed.  The district court explained that the conduct of law enforcement officers in executing a search warrant is governed by reasonableness.  The search must only be made within a reasonable time.  *Id.* at *5; *see also United States v. Syphers*, 296 F. Supp. 2d 50, 58 (D. N.H. 2003) (where court upheld a search of computers seven months after the seizure because the time frame was not unreasonable).

In *United States v. Luken*, 515 F. Supp. 2d 1020 (D. S.D. 2007), the district court analyzed this issue when the officer failed to examine a computer within 10 days.  In *Luken*, officers seized a computer from the Defendant's residence on July 25, 2006 and obtained a search warrant that day.  The computer was sent to an examiner to be analyzed but was returned back to the agent because of an "extreme backlog."  *Id*. at 1032.  The examiner was not able to examine the computer until the end of August 2006.  Assuming the ten-day limitation applied to the time in which the computer should have been forensically examined rather than seized, the court explained that the issue needed to be evaluated under federal Fourth Amendment standards.  *Id.* at 1037.

## 2.    Defendant's motion for a *Franks* hearing should be denied.

Defendant has also moved for a *Franks* hearing, alleging that a statement contained in the affidavit to search the 15 digital devices was false.  Specifically, Defendant argues that the affidavit for the search warrant contains a statement that Defendant has a 2005

conviction for Unlawful Use of a Weapon, which Defendant maintains is false.  Defendant maintains that, without this statement, the warrant would not have been supported by probable cause.

"There is … a presumption of validity with respect to the affidavit supporting [a] search warrant."  *Franks v. Delaware,* 438 U.S. 154, 171 (1978).  A defendant who challenges the validity of an affidavit is entitled to an evidentiary hearing *only* if he makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, *and* if the allegedly false statement is necessary to the finding of probable cause."  *Id.* at 155-56 (emphasis added).  "The 'substantial preliminary showing' requirement needed to obtain a *Franks* hearing is not lightly met."  *United States v. Milton*, 153 F.3d 891, 896 (8th Cir. 1998).  Indeed, in *Franks*, the Supreme Court was careful to articulate what it meant by a substantial preliminary showing:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statement of witnesses should be furnished, or their absence explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted...is only that of the affiant, not of any nongovernmental informant.  438 U.S. at 171.

When a defendant alleges that an affidavit submitted in support of a search warrant application omitted facts, the defendant bears the burden to make that substantial preliminary showing. *United States v. Reinholz,* 245 F.3d 765, 774 (8th Cir. 2001); *see also Franks,* 438 U.S. at 155–56. Specifically, the defendant must also show that the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented. *United States v. Mashek*, 606 F.3d 922, 928 (8th. Cir. 2010) (*citing Reinholz*, 245 F.3d at 774). "Allegations of negligence or innocent mistake will not suffice to demonstrate a recklessness or deliberate falsehood." *Id*. (*citing Franks*, 438 U.S. at 171). Instead, the court must determine "whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011).

In determining whether statements were made with reckless disregard for the truth, courts consider "whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010); s*ee also United States v. Gater*, 868 F.3d 657, 659-60 (8th Cir. 2017). Similarly, where a defendant asserts the affidavit for the search warrant omitted material facts, he or she must make a substantial preliminary showing that (1) the affiant omitted facts with the intent to mislead the issuing judge or omitted the facts in reckless disregard of the fact that the omissions would mislead, and (2) the affidavit, if supplemented by the omitted information

could not support a finding of probable cause.  *Gater*, 868 F.3d at 659-60 (*citing United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015)).

Before a defendant may receive a *Franks* hearing, the reviewing magistrate judge must determine that the allegedly false statement was necessary to the finding of probable cause.  *Franks*, 438 U.S. 155-56; *Keys*, 721 F.3d at 518.

Defendant has not met his burden with regard to either prong of *Franks*. Defendant's argument ignores the substantial volume of information in the affidavit that would establish probable cause, regardless of any alleged imperfections.  First, although the affidavit incorrectly states that Defendant has a 2005 conviction, the statement is hardly a deliberate falsehood or reckless disregard for the truth.  Indeed, in 2005, Defendant pleaded guilty to Unlawful Use of a Weapon in the Circuit Court for the City of St. Louis, Missouri.  However, Defendant only received a suspended imposition of sentence (SIS). Although imposition of a SIS by a court may not be a felony conviction, it can hardly be said that "the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."  *Butler*, 594 F.3d at 961.

Second, the statement was not necessary to the finding of probable cause. Defendant argues that, but for this statement, the magistrate judge would not have authorized the warrant.  Defendant's argument is incorrect and blatantly ignores the ample information establishing probable cause for drug trafficking and firearm-related violations of federal law.  For example, the affidavit explains that officers had learned that Defendant was involved in an ongoing feud with a rival drug faction and had committed several

murders in retaliation.  The affidavit relies upon CW who had a long-standing relationship with Defendant.    Defendant had supplied CW with narcotics.    Additionally, CW participated in multiple murders with Defendant.   CW related that he and Defendant communicated regularly over multiple cellular telephones.

The affidavit also explained that Defendant had been federally indicted in the Eastern District of Missouri.  Following the indictment, officers executed a number of federal search warrants on residences and vehicles associated with Defendant. Among items seized were numerous firearms, ammunition, and the 15 digital devices, including cellular telephones, which were the subject of the warrant.

The affidavit further set out the training, knowledge, and experience of SA Burke. Specifically, the affidavit explained how individuals involved in drug trafficking "rely heavily on mobile telephones to conduct activities related to and in furtherance of the criminal activity" (**Exh. 10** at Aff. pp. 8-9).  Further, individuals involved in the distribution of controlled substances will use these phones to "pass communications, such as instructions, negotiations, directions, and locations, both verbally and in writing via electronic message" (**Id.**).

In removing the inaccurate statement about Defendant's SIS being a "conviction," probable cause was still solidly established within the search warrant affidavit.  It set forth facts more than sufficient to create a fair probability that evidence of a crime would be found within the digital devices, including the cellular telephones.  Additionally, Defendant fails to mount a viable *Franks* challenge, and his request for a hearing should be denied.

## CONCLUSION

For the foregoing reasons and additional information that may be adduced during the course of any evidentiary hearing(s), the United States of America respectfully requests that this Court deny Defendant Anthony Jordan's motion to suppress evidence in its entirety as *all* evidence seized was done lawfully.

Respectfully submitted,

SAYLER A. FLEMING
United States Attorney

/s/ Thomas Rea
THOMAS REA, #53245MO
ERIN GRANGER, #53593MO
Assistant United States Attorneys
111 S. 10th Street, 20th Floor
St. Louis, Missouri  63102
(314) 539-2200

/s/ Sonia V. Jimenez
SONIA V. JIMENEZ, #8818NV
Trial Attorney
United States Department of Justice
Criminal Division, Capital Case Section
1331 F. Street, N.W., 6th Floor
Washington, D.C. 20530
(202) 616-2514
Sonia.Jimenez@usdoj.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 13, 2021, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties and counsel of record.

/s/ Thomas Rea
THOMAS REA, #53245MO
Assistant United States Attorney

85