UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:15CR00404 HEA |
| ) | |
| ANTHONY JORDAN, ) | |
| ) | |
| Defendant. ) | |

**<u>UNITED STATES' SENTENCING MEMORANDUM</u>**

COMES NOW the United States of America, by and through its attorneys, Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and Erin O'Brien Granger and Donald S. Boyce, Assistant United States Attorneys for said District, and hereby files its Sentencing Memorandum. For reasons outlined below, the United States requests a sentence of life imprisonment on each count to be served consecutively.

Between 2007 and 2015, Defendant Jordan led a long term, organized drug trafficking organization that was fueled by prolific amounts of violence. From the streets of St. Louis, Jordan bought and sold kilograms of cocaine at an alarming rate. Building up his drug empire, Jordan maintained his status by enforcing a lethal code against those who snitched, those who stole, and those who targeted his associates. Likewise, his targets' families and friends were not protected from this violence. Before his arrest in 2015, Jordan had murdered 9 individuals, shot multiple other individuals, and left a community – already saddled with violence – in fear.

On February 24, 2025, a jury in the Eastern District of Missouri put an end to Jordan's reign of terror and convicted him of one count of conspiracy to distribute 5 kilograms or more of

1

cocaine, nine counts of possession of a firearm in furtherance of drug trafficking where death results, and one count of possession of a firearm in furtherance of drug trafficking in connection to the shooting of Anthony "Spree" Anderson and multiple firearms seized from residences and vehicles connected to Jordan. Following Jordan's convictions, the United States Probation Office prepared and issued a Presentence Investigation Report ("PSR") and calculated the Defendant's guidelines as life.[1]

In light of Jordan's conduct, the scope of his drug trafficking organization, the time period over which the illegal conduct occurred, the deliberate and continuing steps utilized to evade law enforcement, the level of violence, as well as the advisory sentencing guideline range, the United States respectfully requests that the Court impose a life sentence in this case on each count to be served consecutively. Jordan's conduct warrants this sentence.

## ARGUMENT

In *United States v Haack*, 403 F.3d 997 (8th Cir. 2005), the Court of Appeals described the process that the District Court should follow in determining a sentence in light of *United States v. Booker*, 543 U.S. 220 (2005). The Court should first determine the guideline range based upon all enhancements and the defendant's criminal history. Second, the Court should determine if any guideline departures apply. Finally, the Court should determine if the guideline range is reasonable considering all factors listed in Title 18, United States Code, Section 3553(a). *Haack*, 403 F.3d at 1002-1003.

---

[1] Defendant's adjusted offense level is 48. Under United States Sentencing Guidelines (USSG) § 5, Part A n.2 however, "in rare cases, a total offense level… of more than 42 is to be treated as an offense level of 43."

2

**Advisory Sentencing Guidelines**

The advisory sentencing guideline offense level for Defendant is 43. Because there were multiple victims, counts two through eleven did not group. Each of these offenses carries a recommended term of life imprisonment.

**Title 18, United States Code, Section 3553(a) factors**

Title 18, United States Code, Section 3553(a) lists the following relevant factors for the Court to consider in determining a sentence:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;

2) the need for the sentence imposed --
   (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)  to afford adequate deterrence to criminal conduct;

   (C)  to protect the public from further crimes of the defendant; and

   (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) the kinds of sentences available;

4) the kinds of sentences and the sentencing range established for –
   (A)  the applicable category of offenses committed by the applicable category of defendant as set forth in the guidelines . . .

5) any pertinent policy statement –

   (A) issued by the Sentencing Commission . . .

6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . .

The application of these factors in this case supports a life sentence and the United States highlights

3

some of the pertinent factors in this memorandum.

**(A) The nature and circumstances of the offense and the nature and characteristics of justify multiple life sentences.**

The Court must first consider the nature and circumstances of the offense and the history and characteristics of the defendant. The evidence in this case was presented over several weeks during a jury trial, and so the United States will not reiterate it *in toto* here.

Evidence adduced at trial demonstrated that Jordan was engaged in large scale drug trafficking – the ultimate object of which was to bring cocaine to the streets of St. Louis City, a region already beset with drug-fueled dependence and violence. Evidence at trial established that this organization was highly sophisticated and moved substantial amounts of cocaine.

Antonio Washington formed a drug relationship with Jordan in 2008 wherein Jordan received multiple kilogram quantities of cocaine. In the beginning, Washington sold Jordan between three and five kilograms of cocaine every week. Washington and Jordan were always armed with firearms for protection. Washington then began supplying Jordan with even greater quantities of cocaine – 10 kilograms every two weeks. Additionally, Jordan worked with Derrick Terry to keep cocaine flowing throughout the streets of St. Louis. Both Jordan and Terry received cocaine from Adrian Lemons, who had a direct source of supply from Mexico. Jordan was a highly sophisticated drug trafficker that took great efforts to thwart law enforcement. He didn't talk on the phones; he kept his drugs and money separate; and he compartmentalized the members of their drug trafficking organization.

Hand in hand with Jordan's drug trafficking was violence. In 2008, Gregory Burrows' grandmother's residence was searched by law enforcement pursuant to a search warrant. Investigators seized a firearm and cocaine. Jordan supplied Burrows with cocaine and wanted to

4

know who had tipped off law enforcement. Jordan learned that Al Walters was an informant and set up a deal for Walters to purchase cocaine from him. On April 1, 2008, Walters was seated in a vehicle with Linnie Jackson and Keith Burks when Jordan ambushed their vehicle. Jordan later told Washington he "caught them sleeping" and "almost shot dude [sic] [Walters'] head off." Trial Transcript, ("Trial Tr."), Vol VIII, 45:20-23. Indeed, 21 shell casings from an AK-47 were recovered from the scene, one of which was found next to Al Walters' body, showing it was a shot at close range. Walters had been shot multiple times and suffered fatal injuries to his body and face. Although Jackson and Burks had nothing to do with the search warrant on Burrows' grandmother's residence, they became casualties in Jordan's quest for revenge.

On February 3, 2010, Marquis Jones and Keairrah Johnson were driving down Natural Bridge with two other occupants, completely unsuspecting that Jordan was looking for Jones. While driving with Derrick Terry, Jordan spotted Jones and recognized him as an individual who had stolen cocaine from him. Jordan immediately started shooting at Jones' vehicle and struck both Jones and Johnson who died as a result of their injuries. A shell casing seized from the street was consistent with being fired from an AK-47 rifle.

On May 20, 2012, Jordan continued to seek out those who had violated his drug code. This time, he enlisted the help of Michael "Mike Mike" Brooks to shoot and kill Montez "Tez" Woods, whom Jordan believed had broken into his house and stolen cocaine. Brooks, Jordan, and Washington conducted surveillance to learn the habits of Woods. When they spotted him, Brooks and Jordan ambushed him with a firearm and killed him.

The killing of Woods had consequences and on June 2, 2013, Michael Brooks was murdered by individuals in retaliation for the killing of Woods. Jordan believed Dominic "DD

5

Head" Irons, Terrell "Hell Rell" Beasley, and Anthony "Spree" Anderson were responsible for the killing of Brooks. With the assistance of Gloria Ward, Charles Thompson, and Donte Jacobs, Jordan began searching for these individuals. He combed through databases on the internet and utilized Jacobs to obtain personal information about these individuals and their family members.

Jordan learned that Irons was serving a sentence in the Missouri Department of Corrections. Undeterred, Jordan sought revenge by targeting a relative of Irons, Anthony "Blinky" Clark, a man who Jordan did not know. Through the assistance of Ward, Thompson, and Jacobs, Jordan received a photo of Clark. Jordan learned Clark was at the Dismas House and began conducting surveillance to learn when Clark would arrive and leave the residence. On June 25, 2013, Clark exited the residence with his resume in a manila folder. He stepped into Sierra Blanchard's vehicle, and she proceeded to drive down Cote Brilliante. Jordan spotted Clark leaving the residence. As Blanchard began to drive off, Terry boxed Blanchard's vehicle in, preventing her from being able to leave. Jordan stepped out of Terry's vehicle and fired 14 shots from an AK-style firearm. The shots formed a tight pattern on the windshield. Miraculously, Sierra Blanchard, the driver of the vehicle, was not struck. Clark, however, was stuck multiple times and died as a result of the gunshot wounds. The entire shooting lasted fewer than 15 seconds.

Jordan continued to target those he believed to be responsible for the death of Michael Brooks. On July 1, 2013, he and Washington located Beasley exiting a nightclub. As Beasley drove on I-70 with three other occupants, Jordan and Washington spotted his vehicle and Washington began to shoot at Beasley. Tierra Hogans, a passenger in Beasley's vehicle, immediately put her head down and began to pray as her vehicle was fired upon numerous times. Although Beasley was not struck this time, Jordan did not abandon his plan for revenge. On

6

August 5, 2013, Jordan and Washington learned Beasley was staying on Evans. Washington utilized binoculars to get a good look at Beasley. Jordan fired shots at Beasley striking him multiple times, including in the head.

Thereafter, Jordan began looking for Anthony "Spree" Anderson. Evidence at trial established Jordan believed that Anderson had paid for the hit on Brooks. Jordan learned Anderson's mother resided on Salisbury and began to surveil that area. This time, Jordan recruited Washington to handle the shooting. Jordan drove Washington to the residence and Washington located Anderson. Washington shot Anderson, but only struck him in the leg which angered Jordan. Jordan's targets then expanded beyond those responsible for the killing of Michael Brooks.

Jordan identified two individuals who he believed were going to give support to Irons and others. One of these individuals was Robert "Parker G" Parker. Jordan then began to look for Parker to eliminate him. On December 29, 2013, Washington drove a stolen Infiniti with Jordan sitting in the passenger seat. They spotted Parker driving a tan Yukon and followed his vehicle for blocks. Brittany Ivy was sitting in the front seat of Parker's vehicle. She did not know Jordan or Washington. Parker pulled over on Peck and Courtney Ivy entered his vehicle. Washington drove alongside Parker's vehicle and Jordan immediately began shooting. Ivy ran from the vehicle and Jordan continued to shoot at him as Clara Walker looked outside her window. Jordan shot Walker in the neck and Walker was killed. Jordan later remarked that Walker was killed because "that bi*ch shouldn't have been being nosey." Trial Tr., Vol IV, 86:21-22. Ivy suffered from injuries to his head and back and was unable to communicate with investigators. Investigators recovered 18 shell casings from the scene. As Jordan and Washington were disguised

7

with masks and gloves, no one could give a description of those responsible.

Jordan identified Michail "Yellow Mack" Gridiron as a second individual who was proving support to Irons. Jordan received an image of Gridiron from Ward and learned from Ward and Thompson that Gridiron resided on Rolla Place. Washington and Jordan located an abandoned residence across from Gridiron's address. Through bitter cold nights, Washington and Jordan sat and waited for an opportunity to shoot and kill Gridiron. On January 21, 2014, Washington and Jordan observed Gridiron at his residence. As Gridiron entered a vehicle with another occupant, Jordan and Washington immediately began firing from an AR style rifle and AK-47. Jordan fired his weapon so many times he ran out of bullets. In total, investigators seized over 60 shell casings from the scene. Although the passenger was able to flee, Gridiron was fatally shot.

Most – if not all – of the shootings and murders left no eyewitnesses. Either these individuals were murdered, or the surviving witnesses could not provide any description of the shooters because Jordan disguised himself to prevent from being identified. He never used the same firearm or vehicle so links between these homicides and shootings were left unknown. In 2015 however, law enforcement began closing in. Washington was arrested and indicted for possession of firearms in furtherance of drug trafficking. Jordan became concerned Washington was cooperating with law enforcement. He enlisted Terry and another associate to visit Washington's mother in hopes of learning whether Washington was providing information. During that meeting, Terry believed Jordan was going to kill Washington's mother. Jordan later told Terry that he (Jordan) should kill that b**ch in reference to Washington's mother. Trial Tr., Vol IV, 101:21-22.

On August 7, 2015, law enforcement executed multiple search warrants connected to

8

Jordan.  At 4217 East Sacramento, investigators observed a Mustang and BMW inside a garage. A search of the BMW revealed three firearms including a PS90 fully automatic rifle. Investigators also located a black Infiniti.  A search of that Infiniti resulted in the seizure of three shell casings which Firearms Examiner Katherine Castillo examined.  Examiner Castillo concluded that these shell casings were ejected from the same firearm used in the Parker-Walker homicides.  Investigators also searched the residence at 4223 East Sacramento and located 14 cellular telephones, a bug detector kit designed to detect law enforcement, over 1,000 rounds of ammunition, ballistic vests, and 12 firearms.

On August 26, 2015, a Grand Jury for the Eastern District of Missouri returned an indictment charging Jordan with violations of federal law.  The next day, investigators arrived at 64 Brighton Place to effectuate his arrest.  Despite demands from law enforcement to exit the residence, Jordan refused to come outside for 30 minutes.  Following a search of the residence, investigators seized five firearms. They also search a Pontiac Grand Prix Jordan had been driving and located a Samsung Galaxy SS cellular telephone.  Investigators obtained a search warrant for the phone.  Investigators examining the phone uncovered a historical account of Jordan's crimes in pictures.  Jordan's phone contained images of victims he murdered including Clark and Gridiron, images of individuals he wanted to retaliate against, people finder searches for Antonio Washington, and images of multiple firearms.

Although Jordan has a limited criminal history, this alone does not justify a downward variance.  As demonstrated during the trial, Jordan was actively engaged in criminal activity daily from 2008 until his arrest in 2015.  The damage Jordan has done to this community cannot be overstated.  In addition to distributing kilograms of cocaine, Jordan commenced a wave of

9

violence. Wearing masks, he ambushed his targets and used rifles equipped with large capacity magazines which gave him the ability to fire numerous rounds without stopping to reload. These homicides and shootings occurred during the day and at night, in residential areas and on highways, when people were alone or with others. All in the name of furthering his drug trafficking organization and his reputation as an enforcer.

**(B) A sentence of life imprisonment on each count is sufficient to achieve the statutory sentencing objectives contained in Section 3553(a)(2)**

As stated above, in fashioning a sentence, this Court is obliged to consider the statutory objectives of sentencing as enumerated in Section 3553(a)(2). Those objectives include:

the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2).

The United States will not belabor the seriousness of the offense, as it has addressed that issue elsewhere herein. As Jordan went to trial, this Court heard the details of a massive drug trafficking organization that utilized violence to maintain its' reputation in the City of St. Louis. In the United States' view, life imprisonment on each count adequately promotes respect for the law, particularly in light of Jordan's continuous and escalating criminal conduct in this case. Certainly, Jordan should be punished commensurate with his conduct and the sentence must be significant so as to adequately deter Jordan and others from engaging in similar conduct in the

future. Nothing in his history, or the present conduct, suggests that Jordan will be deterred by anything but the strongest of sentences, and the public at large simply must be protected from any future crimes that he is almost certain to commit. Indeed, the scope of Jordan's enterprise, the duration of the criminal activity, the number of people he brought into his criminal enterprise, and the number of people victimized at his hand or by his direction, all support the recommendation of the sentencing guidelines for an effective term of life imprisonment.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a life sentence in this case on each count to be served consecutively.

Respectfully submitted,

SAYLER A. FLEMING
United States Attorney


 *s/ Erin Granger*
ERIN O. GRANGER, #53593MO
DONALD S. BOYCE, #6282562IL
Assistant United States Attorneys
111 S. Tenth Street, Room 20.333
St. Louis, Missouri 63102
Erin.Granger@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2025, the foregoing motion was electronically with the Clerk of the Court to be served by way of the Court's electronic filing system upon all counsel of record.

 *s/ Erin Granger*
ERIN O. GRANGER, #53593MO
Assistant United States Attorney

11