**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | No. S5-4:15 CR 404-HEA |
| v. | : | |
| | : | |
| ANTHONY JORDAN, | : | |
| | : | |
| Defendant. | : | |

**SENTENCING MEMORANDUM OF DEFENDANT ANTHONY JORDAN**

Defendant Anthony Jordan, through undersigned counsel, submits this Sentencing Memorandum for consideration by this Court.  For the reasons set forth below the defense respectfully requests that this Court vary below the sentencing guidelines and impose a term-of-years sentence.  Such a sentence would be sufficient but not greater than necessary in this case given the nature of the offense and Mr. Jordan's personal history and characteristics pursuant to *United States v. Booker*, 543 U.S. 220 (2005), its progeny, and 18 U.S.C. § 3553(a).

**I.      FACTUAL AND PROCEDURAL HISTORY**

On August 26, 2015 a grand jury sitting in the Eastern District of Missouri returned an indictment charging Anthony Jordan with being part of a conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C § 841(b)(1)(C) (Count One) and two counts of possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A) resulting in death and thereby punishable under 18 U.S.C. § 924(j)(1) (Counts Two and Three).

Over the course of the next three years (2015-2018) a number of the individuals involved in this conspiracy cooperated with the government investigation.  As a result of this ongoing

investigation, the government filed a number of superseding indictments adding co-defendants to the case as well as additional charges against Mr. Jordan. In all, the government charged 33 individuals with having taken part in this drug conspiracy. Many of these individuals also admitted to having utilized firearms and taken part in numerous violent acts in furtherance of the drug conspiracy.

At the time the conspiracy began (January 2002) Mr. Jordan was 15 years old. The conspiracy was organized by the Mexican drug cartel based in Reynosa, Mexico, members of which were charged alongside Mr. Jordan in the superseding indictments, as well as the cocaine kingpin of St. Louis, Adrian Lemons, also a co-defendant in this case.

On January 31, 2025 trial commenced against Mr. Jordan. By that time all 33 co-defendants had either pled guilty (31) or been found guilty (2). The charges against Mr. Jordan at trial consisted of conspiracy to distribute cocaine (Count One), possession of a firearm in furtherance of a drug trafficking crime resulting in death (Counts Two through Ten), and possession of a firearm in furtherance of a drug trafficking crime (Count Eleven).

On February 24, 2025 the jury returned guilty verdicts against Mr. Jordan on all counts. All nine of the resulting-in-death counts (Counts Two through Ten) that Mr. Jordan was convicted of were allegedly based on killings done in furtherance of the drug distribution conspiracy formulated by the cartel and Adrian Lemons.

During trial the government argued that the murders set forth in Counts Seven through Ten were committed as retribution for the murder of Michael Brooks. Michael Brooks and Mr. Jordan grew up together, were the same age, and were best friends. They were practically inseparable. Brooks and Mr. Jordan's co-defendant, Gloria Ward, were brother and sister. Brooks was murdered on June 2, 2013.

On April 14, 2025 the United States Probation Office served a Pre-Sentence Investigation Report ("PSR") on the parties. The PSR concluded that based on an offense level of 43 and a criminal history category of 1 the guideline range is life. *See* April 14, 2025 PSR, ¶ 198.

On May 15, 2025 the government filed its Sentencing Memorandum with the Court. Therein the government asked this Court to impose nine life-without-parole sentences to run consecutive to each other. *See* United States' Sentencing Memorandum at 2. The government has also given notice that it intends to seek a leadership role upward enhancement to the drug conspiracy count under USSG § 3B1.1.

Notably, none of the individuals who conspired with Mr. Jordan were sentenced to life imprisonment but rather each has been sentenced to a finite term of years. Despite this fact, the government is now requesting that Mr. Jordan be sentenced to nine consecutive life-without-parole sentences. The defense, however, respectfully submits that considerations of fairness, consistency, equal protection, and due process weigh in favor of this Court imposing a sentence of a finite term of years.

Sentencing in this matter is scheduled before this Court at 11:00 am on May 29, 2025.

**II.    THE EVIDENCE DOES NOT SUPPORT THE GOVERNMENT'S CONTENTION THAT MR. JORDAN HELD A LEADERSHIP ROLE IN THIS DRUG DISTRIBUTION CONSPIRACY AND ITS REQUEST FOR NINE CONSECUTIVE LIFE SENTENCES IS UNREASONABLE IN LIGHT OF THE SENTENCES IT AGREED TO FOR EACH CO-DEFENDANT.**

The multi-count, multi-defendant indictments in this case set forth a wide-ranging drug distribution enterprise created, organized, and controlled by a Reynosa-based Mexican cartel. The city of Reynosa, in the State of Tamaulipas, is just across the border from McAllen, Texas and was on the United States Department of State's *Do Not Travel* list due to crime and

kidnapping.  "Heavily armed members of criminal groups often patrol areas of the state and operate with impunity, particularly along the border region from Reynosa to Nuevo Laredo."[1]  The Mexican cartel and its members were the suppliers of the cocaine that was distributed in the St. Louis area as well as several other major American cities.  The cartel and its members also received most of the massive profits from this operation.

At the time he was indicted for his involvement in the conspiracy that began when he was 15, Anthony Jordan was 28 years old and had had very minimal contact with the criminal justice system.  He had no prior juvenile adjudications and just one adult conviction at age 18 for illegal possession of a weapon.  He received a sentence of two years probation for that offense and successfully completed that term of probation with no violations.  In fact all parties agree that under the Sentencing Guidelines Mr. Jordan is in Category I.

Furthermore, it is undisputed that Mr. Jordan was not a member of the cartel.  In fact, he was not even in the upper echelon of the illegal enterprise in St. Louis.  Rather, the government's pleadings and trial evidence describe him as being in the fourth tier of the distribution network operating solely in the inner city of St. Louis.  The government's investigation determined that the cocaine went from defendant Velasquez to defendants Garza and Cantu to defendant Lemons to defendant Jordan.[2]

---

[1] *Mexico Travel Advisory*, United States Department of State—Bureau of Consular Affairs, April 20, 2022 (available at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html#Tamaulipas%20state).

[2] *See* Guilty-Plea Agreement, *United States v. Velazquez*, No. 4:15-cr-404-HEA, ECF No. 1967, at 3-4 (E.D. Mo. Dec. 12, 2018); Guilty-Plea Agreement, *United States v. Lemons*, No. 4:15-cr-404-HEA, ECF No. 2238, at 3 (E.D. Mo. May 3, 2019).

The government repeatedly alleged in the multiple indictments that this conspiracy began in January of 2002 when Mr. Jordan was just 15 years old.  Clearly, the cartel would stop at nothing to ensure that its cocaine was easily accessible to the citizens of St. Louis, even if it meant conspiring with a juvenile.

According to the government's pleadings and trial evidence, tractor trailers would be loaded with cocaine in Mexico and then driven from Mexico through the Rio Grande Valley to various cities in the United States.  After the drugs were unloaded in the city, tractor trailers would then be loaded with hundreds of thousands of dollars of United States currency and driven back to Mexico, where the cash was given to the cartel members.

The damage caused by the influx of hundreds of kilograms of Mexican cocaine flowing into St. Louis cannot be overstated.  Violence, murder, and addiction wreaked a tremendous human toll in the neighborhoods of St. Louis.  The cartel members were fully aware of the destruction and devastation they were causing to the St. Louis community.  Yet murder, mayhem, and addiction were viewed as acceptable collateral damage so long as the trucks with the cash continued to arrive on a regular basis back in Reynosa.

The devastating impact that the massive influx of drugs had on St. Louis was certainly foreseeable and widely reported.  Although the cartel and its leaders may not have been physically present when the violence and murders occurred, they are at least equally responsible for them.  Yet not a single member of the Mexican cartel named in the indictment was sentenced to life in prison.  Rather, all who were sentenced received prison sentences of a term of years.[3]

---

[3] Jose Alfredo Velazquez, alleged to have been the highest-ranking member of the cartel charged in this matter, died in 2021 and so was never sentenced.  ECF No. 3598.

5

Furthermore, the "cocaine kingpin" of St. Louis, Adrian Lemons, who admitted to distributing all the cartel's cocaine to fourth-level dealers, including Anthony Jordan, is also not facing life in prison.[4]  Instead Mr. Lemons received a negotiated sentence of 240 months—a sentence which the government agreed was sufficient.

Additionally, none of Mr. Jordan's co-defendants who engaged in multiple acts of violence and murder received a sentence of life in prison.  In fact, of the 33 co-defendants in this case, all have received term-of-years sentences.  The defense recognizes that Mr. Jordan was convicted of having been specifically involved in nine murders.  However, the government asserted that these murders were committed in furtherance of this vast drug conspiracy that was created, operated, and controlled *by the cartel.*

       1)       **Jose Alfredo Velasquez:**  Mr. Velasquez was the lead defendant in this indictment.  He is described by the government as overseeing the cartel operations in Reynosa, Mexico.  He was the "organizer, supervisor, and manager" of the Velasquez/Lemons Drug Trafficking Organization.  This DTO was allegedly responsible for supplying all the cocaine that eventually reached Anthony Jordan and other fourth-level distributors in St. Louis.  Mr. Velasquez was also in charge of making sure the truckloads of cash arrived back in Mexico and were duly taken into the possession of the cartel.  *See* Guilty-Plea Agreement, *United States v. Velazquez*, No. 4:15-cr-404-HEA, ECF No. 1967, at 3-4 (E.D. Mo. Dec. 12, 2018).

As part of his deal with the government, Mr. Velazquez was permitted to plead guilty to drug distribution only.  Pursuant to his plea agreement, he was facing a ten-year mandatory

---

[4] Press Release, U.S. Attorney's Office for the Eastern District of Missouri, May 3, 2019 (available at https://www.justice.gov/usao-edmo/pr/cocaine-kingpin-mexican-cartel-connections-and-his-associate-plead-guilty-drug).

6

minimum sentence. This agreement was not the result of cooperation by Velasquez nor did it require any future cooperation.

Mr. Velasquez was never sentenced. On January 19, 2021 Mr. Velasquez was ordered **released** from United States Marshal's custody and he died on August 9, 2021. *See United States v. Velazquez*, No. 4:15-cr-HEA, ECF No. 3708 (E.D. Mo. Oct. 25, 2021).

2) **Juan Ramon Garza:** Mr. Garza was described by the government as working directly with Mr. Velasquez. Specifically, he, along with Luis Cantu, oversaw operations in St. Louis for Mr. Velasquez. Mr. Garza would receive the bulk shipments of cocaine from Mexico for delivery to Adrian Lemons, who at that time was the main distributor of cocaine in St. Louis. Garza, along with Mr. Cantu, also coordinated and oversaw the return shipments of cash from St. Louis to Mexico. *See* Guilty-Plea Agreement, *United States v. Garza*, No. 4:15-cr-404-HEA, ECF No. 1035, at 4-5 (E.D. Mo. June 14, 2017).

Mr. Garza was essentially the eyes and the ears of the cartel on the ground in St. Louis. Mr. Garza has pled guilty to two counts of drug distribution. As part of this plea agreement, it was stipulated that the government would not seek an enhanced penalty for federal drug trafficking offenders under 21 U.S.C. § 851. This agreement was not the result of cooperation by Garza nor did it require any future cooperation.

As a result of this agreement, Mr. Garza received a sentence of **210 months.**

3) **Luis Fernando Cantu:** Mr. Cantu is described by the government as working directly with Mr. Garza in St. Louis as a facilitator of the operations for the cartel. Specifically, he, along with Mr. Garza, would receive the shipments of cocaine from Mexico and distribute them to Adrian Lemons. He would also facilitate the shipments of cash, via tractor trailer, back to Mexico. *See* Guilty-Plea Agreement, *United States v. Cantu*, No. 4:15-cr-404-HEA, ECF No.

7

1103, at 4-5 (E.D. Mo. July 25, 2017).  Mr. Cantu, like Mr. Garza, acted as the eyes and ears of the cartel in St. Louis.  Mr. Cantu pled guilty to two counts of drug distribution.  This agreement was not the result of cooperation by Cantu nor did it require any future cooperation.

As a result of this plea Mr. Cantu received a sentence of **60 months**.

**4)** **Adrian Lemons:** At the time of his arrest in this matter, Mr. Lemons was described by the United States Attorney's Office for the Eastern District of Missouri in a May 3, 2019 press release as the "Cocaine Kingpin with Mexican Cartel Connections."  Mr. Lemons worked directly with members of the cartel to distribute cocaine throughout metropolitan St. Louis as well as southeastern Missouri.  He managed the DTO alongside Jose Velasquez. Mr. Lemons' management included use of firearms, multiple stash houses, murder and violence and threats of violence.  *See* Guilty-Plea Agreement, *United States v. Lemons*, No. 4:15-cr-404-HEA, ECF No. 2238, at 3 (E.D. Mo. May 3, 2019).

According to the government, Mr. Lemons supplied Anthony Jordan with the cocaine that he allegedly distributed.  Mr. Lemons would receive the bulk shipments from the cartel and then break them down into smaller quantities that he would sell to several local drug dealers in St. Louis, including Mr. Jordan.  Anthony Jordan was just one of several St. Louis dealers that received their cocaine from Lemons.

Adrian Lemons struck a deal with the government that allowed him to plead to a single count of conspiracy to distribute drugs.  This agreement was not the result of cooperation by Lemons nor did it require any future cooperation.  And as with Mr. Garza, it was further agreed that the government would not seek an 851 enhancement.

As part of this plea the government agreed to a total sentence of **240 months**, which is what Mr. Lemons received.

8

**5)  Gloria Ward:**  Gloria Ward pled guilty to conspiracy with Anthony Jordan in the murder of four individuals in furtherance of the drug conspiracy.  She entered into a plea agreement with the government and was sentenced to **420 months** incarceration.  On April 23, 2025 this sentence was reduced to **time served, amounting to 111 months**.

**6)  Charles Thompson:**  Mr. Thompson is alleged to have been directly involved with Anthony Jordan in four murders and one attempted murder in furtherance of the drug conspiracy.  Mr. Thompson entered into a plea agreement with the government and received a sentence of **540 months** incarceration.

**7)  Maurice Woodson:**  Mr. Woodson was alleged to have direct involvement in three murders, as well as the attempted killing of a federal witness.  Mr. Woodson entered into this plea agreement and was sentenced to term of **276 months**.  This agreement was not the result of cooperation by Woodson, nor did it require any future cooperation.

**8)  Derrick Terry:** Mr. Terry readily admitted to being personally involved in and committing a number of murders as well as extensive drug trafficking.  Mr. Terry also had an extensive criminal history including having served a prior federal sentence for drug trafficking.  Mr. Terry also admitted to committing a number of these violent acts and drug distribution offenses while on federal supervised release.  On March 12, 2025 he received a total sentence of **115 months**.

**9)  Antonio Washington:** Mr. Washington readily admitted to being personally involved in and committing a number of murders as well as extensive drug trafficking offenses.  He received a total sentence of **60 months.**

The defense is certainly aware that Mr. Jordan was convicted of involvement in nine homicides in addition to the drug distribution charge.  However, the context is important.  All of

9

these homicides were allegedly committed in furtherance of the drug conspiracy that began when he was 15 years old. The Mexican cartel flooded St Louis with cocaine, with total disregard for the violence that ensued. Given the sentences the other high-level co-defendants received, sentencing Mr. Jordan to life without parole would defy principles of fairness and consistency in sentencing, and so a variance is appropriate here.

### III. ANTHONY JORDAN EXPERIENCED MULTIPLE ADVERSE EXPERIENCES THAT MADE HIM VULNERABLE TO THE NEGATIVE INFLUENCES OF THE CARTEL.

As noted above, this case arises from a drug distribution conspiracy that the government asserts began when Anthony Jordan was 15 years old. At that age, he had suffered, and was suffering from, multiple threats to his wellbeing—including ongoing parental neglect, and community violence all of which further hampered decision-making problems commonly associated with adolescent brain development. These adverse experiences made him vulnerable to the older adults who he is alleged to have conspired with.

Anthony Jordan grew up facing overwhelming adversity in multiple areas of his life. Trauma and neglect profoundly harmed him and derailed his life trajectory. The cumulative effect compromised his healthy development through all stages of childhood and adolescence. His behavior and the choices he made in his adolescent and young adult years were the result not of any single incident but of the totality of the impact of neglect and trauma he encountered.

The neighborhood Anthony grew up in is one of the most impoverished, violence-ridden communities in St. Louis. It has been in a steady state of decline since the 1970s and is disenfranchised from social services, resources, and opportunity. This left Anthony without the type of external supports typically available in impoverished communities.

Anthony's childhood home was surrounded by drug activity, gangs, and the violence that accompanies them. Gun violence was so frequent and so common that it was considered normal. Anthony found himself in life-threatening situations regularly. People he knew were regularly killed and he himself became a victim of the violence when he was shot at age 18.

Thriving in this dangerous and disadvantaged environment was inherently difficult, but in Anthony's case, his neighborhood conditions were exacerbated by the lack of stable adult supervision, guidance and nurturing in his home. Anthony's mother worked long hours at two full-time, low-wage jobs and often slept at the second job rather than going home. His father was imprisoned for robbery for the bulk of Anthony's childhood. When he was around age 10, with the adults in his life absent, Anthony's teenage older half-sister began caring for him as best as possible, but that limited help also ended when Anthony was 14 and she left home to start a family of her own. At this point, Anthony was alone, cut off by his mother and abandoned by relatives who had died or moved on with their lives.

At the point Anthony stepped into the responsibility for raising himself, he lacked the foundation that is the goal of early developmental stages: emotional and behavioral self-regulation, healthy coping mechanisms, and the ability to develop healthy, supportive relationships. And sadly, at this young age, when Anthony was looking for positive adult role models, he instead was alleged to have conspired with older individuals. Anthony was particularly vulnerable to this indoctrination because of his immature and stunted brain development, as well as his repeated neglect and trauma.

Normally, older mentors such as teachers and coaches help youngsters ease their transition to adulthood. Instead, in Anthony's case, those he looked to for guidance only inculcated him in dangerous and risky behavior, to which he was not well-equipped cognitively

11

to avoid.  Because the juvenile brain has not completely developed but rather is changing well into early adulthood, adolescents are especially prone to social influence, and their brains and minds are more highly malleable to environmental influences, which is known neurobiologically as plasticity.  *See, e.g.*, *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (recognizing that juveniles have an "underdeveloped sense of responsibility," that they are "more vulnerable or susceptible to negative influences and outside pressures," and that their "character is not as 'well formed' as an adult's").  Because of the juvenile brain's plasticity, negative influences exert a stronger and more permanent impact on an individual. Simply, because Anthony was continuing to develop at the time Anthony allegedly entered the drug conspiracy, his brain was especially malleable to these negative outside influences.

The threats and deprivations Anthony experienced growing up are known to have a prominent impact on emotion-guided behaviors, cognitive functioning, and self-control.  And the timing matters: Anthony suffered these environmental insults during adolescence when such adversity has been shown to have the strongest impact on the development of the prefrontal cortex, which is crucial for cognitive functioning and self-control.

As a result, he was particularly vulnerable to the influences of older adults.  As alleged, the drug conspiracy began when Anthony was at an age when his brain plasticity made the presence of positive and negative influences even more important.  At a time when Anthony was effectively on his own and when positive influences could have helped steer him in a different direction, older individuals took advantage of his malleability.  At this young age, Anthony lacked positive influences to counter these negative influences.

These negative influences on the teenage Anthony Jordan not only help explain his decision-making as a juvenile but also help to contextualize the allegations made against him as

12

a young adult. It is undisputed that all the killings the government alleges Anthony committed occurred when he was between the ages 18 and 27. However, each of these killings arises from the drug conspiracy alleged to have begun when Anthony was just 15 years old. Anthony's negative adolescent experiences—from his adverse neighborhood and family environment to the older influences—set him on the path to the conduct the government alleges he committed as a young adult.

Thus, Anthony Jordan's adult conduct can be directly traced to the cumulative damage that was done to him through ongoing childhood neglect and trauma during the crucial trajectory setting period of his youth, as even the Department of Justice has acknowledged.[5] So, not only did the older individuals—including many of those charged and ultimately sentenced to terms of years in this case—take advantage of Anthony's vulnerability, but also they further set him on a difficult course fated with additional poor life outcomes.

---

[5] Department of Justice reports have recognized several risk factors in childhood that lead to criminal conduct: medical problems (brain damage and trauma), neglect, poverty, constant exposure to neighborhood violence, and other traumatic events (being shot). *See* Michael Shader, *Risk Factors for Delinquency: An Overview*, U.S. Department of Justice, Office of Justice Programs (2003), https://www.ojp.gov/ncjrs/virtual-library/abstracts/risk-factors-delinquency-overview; Development Services Group, Inc. *Risk Factors for Delinquency*, Office of Juvenile Justice and Delinquency Prevention (2015), https://www.ojjdp.gov/mpg/litreviews/Risk%20Factors.pdf.

IV.     CONCLUSION

For all of the reasons set forth above, the defense respectfully requests that the Court vary below the applicable sentencing guidelines and impose a prison sentence of a term of years.  This will allow Mr. Jordan access to prison programs and provide him with some hope as he undertakes his rehabilitation efforts.

Respectfully submitted,

COUNSEL FOR DEFENDANT
ANTHONY JORDAN


*/s/ James J. McHugh, Jr.*
JAMES J. McHUGH, JR.
Office of the Federal Community Defender
for the Eastern District of Pennsylvania
601 Walnut Street, Ste. 540 West
Philadelphia, Pennsylvania 19106


*/s/ Katrina Young*
KATRINA YOUNG
Office of the Federal Community Defender
for the Eastern District of Pennsylvania
601 Walnut Street, Ste. 540 West
Philadelphia, Pennsylvania 19106

*/s/ Victor Abreu*
VICTOR ABREU
Office of the Federal Community Defender
for the Eastern District of Pennsylvania
601 Walnut Street, Ste. 540 West
Philadelphia, Pennsylvania 19106


*/s/ Diane Dragan*
DIANE DRAGAN, ESQ.
Dragan Law Firm, LLC
9051 Watson Road, #321
Crestwood, MO 63126

**CERTIFICATE OF SERVICE**

    The undersigned hereby certify that on May 22, 2025, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Erin Granger and Don Boyce, Assistant United States Attorneys and counsel of record.

    */s/ James J. McHugh, Jr.*
JAMES J. McHUGH, JR., ESQ.
Federal Community Defender Office for
the Eastern District of Pennsylvania
601 Walnut Street, Ste. 540W
Philadelphia, PA 19106


    */s/ Katrina Young*
KATRINA YOUNG, ESQ.
Federal Community Defender Office for
the Eastern District of Pennsylvania
601 Walnut Street, Ste. 540W
Philadelphia, PA 19106


    */s/ Victor Abreu*
VICTOR ABREU, ESQ.
Federal Community Defender Office for
the Eastern District of Pennsylvania
601 Walnut Street, Ste. 540W
Philadelphia, PA 19106


    */s/ Diane Dragan*
DIANE DRAGAN, ESQ.
Dragan Law Firm, LLC
9051 Watson Road, #321
Crestwood, MO 63126